[No. 30071. Department Two. November 7, 1946.]

THE STATE OF WASHINGTON, *on the Relation of Eugene Thorp, Appellant,* v. WILLIAM F. DEVIN, *as Mayor of the City of Seattle, et al., Respondents.*[1]

[1]Reported in 173 P. (2d) 994.

*Erle W. Horswill,* for appellant.

*A. C. Van Soelen* and *J. Ambler Newton,* for respondents.

STEINERT, J.—This is an appeal from a judgment dismissing a petition for a writ of mandate which, if it had been granted, would have compelled the city of Seattle, its mayor, and fire chief to put into immediate operation the provisions of an initiative ordinance reducing the hours of work of Seattle city firemen, but prohibiting any reduction in their existing salaries.

The initiative ordinance reads as here set forth in .full:

"AN INITIATIVE MEASURE

"To THE HONORABLE MAYOR AND CITY COUNCIL OF SEATTLE:

"The undersigned voters of Seattle, King County, Washington, hereby propose and request the enactment of an ordinance as follows:

"ORDINANCE No. (74805)

"AN ORDINANCE providing for a forty-eight hour week for members of the uniformed force of the Seattle Fire Department.

"BE IT ORDAINED By the City of Seattle as follows:

"Section 1. No member of the uniformed force of the Fire Department shall be required to be on duty more than 48 hours in any one week, except in case of a fire emergency; provided, that an arrangement may be made whereby the hours of duty for such members when averaged over each consecutive fifty-two weeks shall not be more than at the rate of 48 hours per week.

"Section 2. No reduction shall be made in the existing

salaries of such members by reason of the enactment of this ordinance."

The proposed ordinance was duly and regularly prepared and submitted to the voters of Seattle under the provisions of the city charter which was then in force, and which will hereinafter be referred to as the old charter.

At a regular municipal election held March 12, 1946, the initiative measure received the requisite majority of votes in its favor, as shown by the return of the canvassing board made March 21st, and on March 26th the acting mayor issued a proclamation declaring the measure to be in full force and effect as an ordinance of the city of Seattle, as required by the provisions of the old charter as well as by the terms of the new charter, to both of which more specific reference will presently be made.

At that same election, held March 12, 1946, the voters of Seattle duly and regularly adopted a *new* charter, which differed from the old one in certain respects material to the present controversy. The old charter contained a provision, Art. IV, § 1 (paragraph 7), reading as follows:

"Any measure [initiative] thus submitted to the vote of the people, which shall receive in its favor a majority of all the votes cast for and against the same, shall become an ordinance of the City of Seattle, and be in full force and effect *from and after proclamation by the mayor*, which shall be made, and published in the city official newspaper, within *five (5) days after the election.*" (Italics ours.)

The new charter contained this same provision, in Art. IV, § 1F, but with this proviso:

"Provided that if such adopted ordinance *contemplates* any expenditure which is not included in the current budget, or which is not to be paid from an existing bond issue, or which eliminates or reduces an existing revenue; such expenditure or elimination shall not be lawful until after the next succeeding budget shall take effect; Provided, further, that the above restriction shall not be operative when less than twenty thousand dollars is *involved.*" (Italics ours.)

In this case, no question of payment "from an existing bond issue" and no question of an expenditure which will

eliminate or reduce "an existing revenue" are involved, but only a question relating to an expenditure "which is not included in the current budget."

The election board duly canvassed the votes cast with reference to the new charter and certified the result thereof on March 21, 1946, the same day on which the canvass and return were made with respect to the initiative measure.

Thereafter, on April 29, 1946, the city council of Seattle passed ordinance No. 74925, which was approved by the mayor on May 1st. That ordinance, after referring to the adoption of the initiative measure set forth above, recited various reasons why the working conditions, the expenditures required thereby, and the present budgetary restrictions contemplated by the measure made it impossible to put that measure immediately into operation, and then ordained that the chief of the fire department take the necessary steps to place the uniformed fire force on a forty-eight hour work week on *January 1, 1947,* and in the meantime to recruit and train additional firemen necessary and sufficient to accomplish the purpose and object of the initiative measure.

Prior to the adoption of the initiative ordinance, the hours and wages of the city firemen had been based on a seventy-two hour work week, under what is termed a two-platoon system. That system and schedule have been maintained by the municipal authorities continuously ever since, despite the adoption of the initiative measure. Respondents predicate their refusal, or rather failure, to put the initiative measure into immediate operation on two alternative grounds, as recited in the later ordinance No. 74925: (1) that to use the present force on a forty-eight hour work week basis would create a seriously dangerous condition of fire protection; and (2) that, if the initiative ordinance were put into immediate operation, it would require the creation of a three-platoon system together with the expenditure therefor of approximately four hundred thousand dollars during the remainder of the year 1946, such amount not being included in the current budget and for which no provision could presently be made.

Appellant concedes that if the matter of expenditures for an additional quota of firemen can be considered relevant to the present issue, the amount necessary therefor would exceed twenty thousand dollars. The new charter provides that any expenditure in excess of that amount which is not included in the current budget shall not be lawful until the next succeeding budget shall be in effect.

Two questions are presented upon the appeal. The first question is whether the operative effect of the initiative measure is determined and governed by the old charter or, on the contrary, by the new charter. Appellant contends that the old charter is controlling in that respect, and that the new charter was intended to operate only upon new initiatives arising by petition filed after the effective date, and under the authority, of the new charter. He argues that any other construction of the new charter would give it a retroactive effect, antagonistic to the rule of statutory construction that a statute is presumed to operate prospectively only and will not be given a retroactive effect unless, by its terms, it shows clearly that such was the legislative intent. Respondents take the opposite position, contending that, upon the adoption of the new charter, it became the entire organic law of the city and therefore superseded the old charter with respect to the matter here involved, and that, by virtue of the prior effective date of the new charter, its operation is in fact and law altogether prospective and in no sense retroactive.

As stated above, the election, both upon the new charter and upon the initiative measure, was held on March 12, 1946, that is to say, the voting on both propositions took place on that day; on March 21st, the election board canvassed the vote and certified the results as to both of those matters; and, on March 26th, the acting mayor of Seattle issued his proclamation relative to the adoption of the initiative measure, as required by the express terms of both charters.

Article XI, § 10, of the state constitution, relating to the incorporation of municipalities and adoption of charters therefor, provides:

338

" . . . Such proposed charter shall be submitted to the qualified electors of said city, and if a majority of such qualified electors voting thereon ratify the same, it shall become the charter of said city, *and shall become the organic law thereof, and supersede any existing charter,* including amendments thereto, *and all special laws inconsistent with such charter.* . . ." (Italics ours.)

Rem. Rev. Stat., §§ 8953, 8954 [P.P.C. §§ 364-7, 364-9], enacted in 1890 and implementing the constitution, provide for the framing of charters by fifteen freeholders previously elected and for the submission of charters so framed to the qualified voters of the city at an election duly called and held for that purpose.

Rem. Rev. Stat., § 8955 (chapter 137, § 1, Laws of 1925, Ex. Ses.) (now Rem. Supp. 1945, § 8955 [P.P.C. § 367-1]) relates to the *revision* of charters by altering, changing, revising, adding to, or repealing previously existing charters, and provides for submitting such *new charters* to the qualified electors of the city for ratification or rejection.

Rem. Rev. Stat., § 8956 [P.P.C. § 367-3] (chapter 137, § 2, Laws of 1925, Ex. Ses.), provides that such new or revised charter shall be submitted to the qualified electors of the city,

" . . . and if a majority of such qualified electors voting thereon ratify the same *it shall become the charter of said city, and shall become the organic law thereof and supersede any existing charter."* (Italics ours.)

The new charter which is here involved was prepared, submitted, and adopted pursuant to the provisions of Rem. Rev. Stat., §§ 8955, 8956, relating to *revision* of charters.

While § 8956 employs the general phraseology used in Art. II, § 10, of the constitution and provides that, if a majority of the qualified electors ratify the proposed new charter, it "shall become the charter of said city, and shall become the organic law thereof," neither the constitution nor the statute specifies or indicates the exact time when such proposed or new charter shall take effect. The determination of that question in this instance has considerable bearing on the present controversy, for the reason that, if the

new charter became effective *prior* to the effective date of the initiative measure, the new charter would be controlling. There would then be no valid ground for contending, as appellant contends, that only by giving the new charter a retroactive effect could it dispel or postpone the immediate operation of the initiative measure as adopted. We therefore turn our attention to a consideration of the question thus suggested.

Under the laws of this state, all elections are conducted according to the manner provided by an election board consisting of the chairman of the board of county commissioners, the county auditor, and the prosecuting attorney in each county. Rem. Supp. 1945, § 5147 [P.P.C. § 522-9]. This board also constitutes the canvassing board for all such elections. Rem. Rev. Stat., § 5148 [P.P.C. § 522-11]. The vote in city elections is canvassed and the returns made by the same officers and in the same manner as for general elections. Rem. Rev. Stat., § 5201 [P.P.C. § 529-53]. Canvass of the votes and return of the results from general elections must be made on the tenth day after the day of each election. Rem. Rev. Stat., § 5340 [P.P.C. § 525-21].

In view of these latterly-mentioned statutes with reference to the holding of elections, canvassing the votes, and making returns thereon, taken in connection with Rem. Rev. Stat., §§ 8955, 8956, relating to the adoption of revised charters, some question might at times arise, as apparently was suggested to the trial court, as to whether the effective date of a city charter is the day on which the charter election is held or whether it is the day on which the canvass and official return of the result are made.

While this question has not often arisen, the cases upon the subject seem to be in general accord to the effect that the legislature has the power, within constitutional limitations, to provide for the manner in which the result of an election shall be determined and declared, and where the legislature has so provided, an election is not complete until the ·legislative mandate is obeyed. 29 C. J. S. 325,

Elections, § 222; 18 Am. Jur. 357, Elections, § 268. There is some room for argument, however, that provisions of an election statute which affect the receiving and recording of the ballot and the canvass of the vote, are merely directory, and that therefore the election is complete when the electors have expressed their will.

■ In the case at bar, it is immaterial whether we consider the date of the election or the date of the canvass and return thereof as the effective date of the new charter, for, in either instance, the result will here be the same. In either instance, the effective date of the new charter will have antedated the effective date of the initiative measure by five days. This is so for the reason that both the old charter and the new charter expressly provide that any measure submitted to the vote of the people and receiving in its favor a majority of all the votes cast for and against it shall become an ordinance of the city and be in force and effect from and after proclamation by the mayor, which shall be made and published within *five days after the election.*

If the new charter became effective on March 21st, when the canvass of the vote was completed and the return thereon made, the initiative ordinance did not become effective until March 26th, when the proclamation of the mayor was actually made. If, on the other hand, the new charter became effective on the date of the election, March 12th, the initiative ordinance could not have become effective until the proclamation thereof was made, within five days *after the election.*

■ As to the *operative* effect of a legislative enactment, the rule in this state, and elsewhere generally, is that a statute or an ordinance speaks only from the time it goes into effect. *State ex rel. Hardy v. Superior Court,* 155 Wash. 244, 284 Pac. 93; *State ex rel. French v. Seattle,* 187 Wash. 58, 59 P. (2d) 914.

■ Under these circumstances, the new charter, which in any event became effective before the effective date of the initiative measure, does not operate retroactively with respect to the initiative ordinance, as contended by appellant, but operates entirely in a prospective manner.

An analogous situation was presented to this court in *State ex rel. School Dist. No. 301 v. Clausen,* 109 Wash. 37, 186 Pac. 319, wherein the facts were these: On May 24, 1919, a school district regularly called and held a special election upon a proposition which, if adopted, would have enabled the district to borrow the sum of seventy-five thousand dollars for the erection of certain school buildings, and to issue its negotiable interest-bearing bonds evidencing its indebtedness in that amount. The proposition and its adoption were in accordance with Rem. Code, § 4607, which provided that bonds so issued should bear interest payable annually or semiannually and should be redeemable at such time "as may be designated in the bonds, but not to exceed twenty (20) years from date of issue."

Within a short time after the election, the state officers who possessed authority to invest the permanent school fund submitted a bid for the bonds to be so issued. The bid was accepted, but on June 12, 1919, before the bonds had actually been issued, a statute (Laws of 1919, p. 216, § 12) went into effect, amending Rem. Code, § 4607, and providing that all school district bonds issued for the erection of buildings of a permanent character "shall be made payable in semi-annual installments, beginning the third year, over any period not exceeding forty years from date."

Upon refusal of the state auditor to accept the bonds and issue warrants therefor, the school district instituted an action to compel him to do so. This court, in denying the requested relief, held that the power of school districts was wholly a legislative matter and could be taken away or limited by the legislature after once being granted. The court further held that, no contractual rights of any nature having accrued with reference to the proposed bond issue prior to the going into effect of the amendatory act, the latter act operated to dispossess the school district of power to issue the bonds as proposed and voted, and for which the bid in question was made.

In *State ex rel. Rose v. Hindley,* 67 Wash. 240, 121 Pac. 447, this court considered the effect of a new charter upon a salaried position created by a former charter. In holding

that the position ceased upon the adoption of the new charter, the court said:

"This court has many times noticed and followed the rule that a new law purporting to be the whole law upon the subject-matter of which it relates repeals a former general law on that subject, even though the new law contains no express repealing clause. [Citing cases.]

"It follows that, since the new charter was adopted as a new and complete charter, and in no sense as an amendment of the old one, it thereby became the entire organic law of the city, and all the provisions of the old charter were thereby effectually repealed, although we do not find in the new charter any express repealing language directed against the old charter."

In the case at bar, the new charter, being a revision of the old charter, became the sole and complete organic law of the city of Seattle, superseding the old charter, including any amendments thereto, and all special laws inconsistent with the new charter. Upon the first question involved in this appeal, we hold against appellant's contention.

The second question presented by the appeal arises upon appellant's contention that, in any event, the restriction contained in the new charter does not apply to the initiative ordinance. The restrictive language in the new charter provides that, if any adopted ordinance *contemplates any expenditure in excess of twenty thousand dollars which is not included in the current budget,* such expenditure shall not be lawful until after the next succeeding budget shall take effect. It is conceded that the next succeeding budget involved in this case will not take effect until January 1, 1947.

Appellant's contention is that the initiative measure does not *contemplate* any particular fixed expenditure, but "contemplates" only (1) a reduction in hours of work of firemen to a forty-eight hour work week level and (2) the maintenance of their existing salaries; that the matter of expenditures is purely incidental, to be taken care of by the city council through its legislative and administrative processes. This contention and the argument thereon require con-

sideration of the meaning of the word "contemplates," as used in the new charter.

Appellant's counsel quotes the definition as taken from Webster's New International Dictionary (1941):

"1. To mediate on; to study; 2. *to have in view as contingent or probable* or as an end or intention; to purpose or intend." (Italics ours.)

Funk & Wagnall's New Standard Dictionary (1929) defines the word thus:

"1. To look at attentively; hence, to consider thoughtfully; meditate on; think on. 2. To consider with a view of accomplishing; intend; plan. 3. *To treat of as contingent or possible.* (Italics ours.)

Oxford's Dictionary (Murray, 1893), defines it as:

"1. To look at with continued attention, gaze upon, view, observe; 2. to view mentally; to consider attentively, meditate upon, ponder, study. 3. To consider in a certain aspect; to look upon, regard. 4. *To have in view,* look for, expect, *take into account as a contingency to be provided for.*" (Italics ours.)

Selecting one of the definitions permissible by these lexicons, and using it in place of the word "contemplates," the proviso in Art. IV, § 1F of the new charter would read:

"Provided that if such adopted ordinance *have in view as contingent, probable or possible* any expenditure which is not included in the current budget," etc.

The question then would be: Does the initiative ordinance have in view as contingent, probable, or possible any expenditure which is not included in the current budget?

The evidence in this case shows, and the fact is, that if the present force of firemen were required to be on duty only forty-eight hours a week, instead of seventy-two hours, the city of Seattle would either be left utterly without fire protection during twenty-four hours of each week, or else, in order to maintain continuous protection, the force on duty during any particular period would have to be reduced by one third. The evidence also shows without dispute that to maintain a three-platoon system, affording complete and constant fire protection, would require the

employment of an additional quota of firemen, involving an expenditure of approximately five hundred thousand dollars between the time of the adoption of the initiative measure and January 1, 1947.

Appellant makes this concession in his brief:

"It is true that the expenditure, if the plan proposed by the Fire Chief were put into effect, would be over $20,000 [the amount specified in the new charter as not being within its restrictive provision]. On the other hand, if so desired by the City, as shown by the evidence, the hours might be reduced, *with a lowering of efficiency it is true,* without any expenditure whatsoever or with a varying degree." (Italics ours.)

The firemen themselves no doubt would be the last to concede that the work heretofore done by them in seventy-two hours could as easily and efficiently be performed by them in forty-eight hours, and they no doubt would likewise readily concede that to employ men sufficient to make up a third platoon would involve expenditures for salaries comparable with their own.

It is inconceivable that the electors who voted in favor of the initiative measure contemplated that the city would thereby be left with inadequate fire protection, or, to state it in converse form, it may be safely assumed that the electors contemplated that the present standard of fire protection was to be maintained. Any intelligent voter would also know, or have in mind the probability, that to maintain the present standard of protection would require the addition of a large force of firemen, involving a tremendous cost, regardless of whether the necessary money came out of a future budget or out of the present emergency fund. No matter whence the required funds were to be derived, the expenditures would have to be made, in order to accomplish the needs of the city occasioned by the adoption of the initiative ordinance.

While the charter might have used some word or phrase which would have expressed its intent with greater precision than the word "contemplates," we do not believe that any such substituted word or phrase would have much

improved, or have been greatly preferable to, the definition above given, "to have in view as contingent, probable, or possible." To say that when the voters adopted the initiative measure they had in view only the matter of reducing the number of work hours for firemen and the maintenance of their existing salaries, without regard to the immediate consequences or necessities involved therein, would be to ascribe to them either a reckless disregard of the safety of their own lives and property, or else a total lack of conception of the relation between services required and the cost thereof. We do not think that the citizens of any community would be so devoid of care for self-preservation or so lacking in knowledge of the fundamental principles of financial matters.

The general purpose or spirit of a legislative act must always be held in view, and absurd consequences avoided as far as possible. *Dennis v. Moses,* 18 Wash. 537, 52 Pac. 333, 40 L. R. A. 302; *State v. Asotin County,* 79 Wash. 634, 140 Pac. 914; *In re Horse Heaven Irr. Dist.,* 11 Wn. (2d) 218, 118 P. (2d) 972; *Martin v. Department of Social Security,* 12 Wn. (2d) 329, 121 P. (2d) 394. A thing which is within the object, spirit, and meaning of a legislative act is as much within the act as if it were within the letter. *State ex rel. Spokane United Rys. v. Department of Public Service,* 191 Wash. 595, 71 P. (2d) 661; 2 Lewis' Sutherland Statutory Construction (2d ed.), §§ 369, 379.

We are entirely convinced that the initiative measure, its proponents, and its adopters did *contemplate* the expenditures made necessary by the immediate operation of the measure.

The judgment is affirmed.

MILLARD, C. J., SIMPSON, MALLERY, and SCHWELLENBACH, JJ., concur.