[No. 36927.    En Banc.    March 11, 1965.]

GLORIA M. KRYSTAD et al., Appellants, v. DAVID LAU et al., Respondents.*

*Reported in 400 P. (2d) 72.

*Samuel B. Bassett, Hugh Hafer,* and *Bassett, Donaldson & Hafer,* for appellants.

*Bogle, Bogle & Gates, J. Tyler Hull,* and *Dustin C. McCreary,* for respondents.

HALE, J.—Extremes beget extremes; violence, in act or attitude, induces violence. Action in the affairs of men—as in the world of physics—tends to produce an equal and opposite reaction.

Respondent David Lau, an American citizen of Chinese ancestry, will have nothing to do with the Laundry and Dye Works Drivers' Union, Local 566. He says in his affidavit that, in 1947, when he and his wife, Kow May Lau, began the laundry business, members of the union threatened him with physical violence. Respondent David Lau says that he sought to join the union but it refused him membership because of his oriental ancestry. Union representatives told him at the time, he says, that the union did not accept orientals in membership. Today, respondents, doing business as the Esquire Cleaners and Laundry, refuse to employ members of a labor union and will discharge any of their employees who join a labor union.

At the time the union rejected David Lau in 1947, he and his wife carried on the business. By 1961, when this action commenced, Esquire Cleaners had 58 employees operating 13 call offices for receiving and distributing laundry, a dry cleaning plant and a shirt laundry.

In October, 1961, four of their employees (appellants) joined the Laundry and Dye Works Drivers' Union, Local No. 566, and designated it as their collective bargaining agent to negotiate wages, hours and employment conditions. Respondent David Lau thereupon summarily discharged them, solely because of their joining and designating the union as their collective bargaining agent.

The four discharged employees bring this unique action, seeking damages for claimed unlawful interference with

and coercion against their right to join and designate a labor union as their collective bargaining agent; they seek an injunction against such interference and coercion, and damages for loss of wages occasioned by the loss of employment.

Meeting these issues head on, the employers, with commendable candor, acknowledge that they discharged the four plaintiffs because of their joining and designating the union as their bargaining agent, and let the case rest on the premise that they had a right to do so. With few, or perhaps no, guideposts in the literature, the learned trial judge moved the case on its way here in denying plaintiffs' motion for summary judgment on the ground that plaintiffs had failed to establish a basis for liability upon which relief could be properly granted, and entered judgment of dismissal on defendants' cross-motion for the same reason. Plaintiffs, employees, bring this appeal.

The precise issue in the case emerges more clearly if we state respondents' position first. Respondents say that an employer has a right to hire and fire at will unless this right has been abrogated or qualified by contract or statute; that Washington has never abrogated or qualified this right by statute; and that the facts show no contract establishing a term of employment.

Appellants, employees, tacitly concede the common-law right in the employer to discharge without cause, or for any cause however frivolous, but they say that Washington has a statute which abridges and qualifies the common-law rule. They refer to RCW 49.32.020, Laws of 1933, Ex. Ses., chapter 7, § 2, p. 10, frequently called the little Norris-LaGuardia Act.

Respondents counter this proposition with the argument that the little Norris-LaGuardia Act conferred no substantive rights, that § 2 thereof invoked by appellants is merely a declaration of policy, and that the entire act is fundamentally a limitation on the power of the court to grant injunctions in cases growing out of labor disputes and, additionally, renders unenforceable agreements to repudiate labor unions ("yellow-dog" contracts, RCW 49.32.030).

The whole case resolves into a problem of statutory construction.

Does Laws of 1933, Ex. Ses., chapter 7, § 2, p. 10 (RCW 49.32.020, the little Norris-LaGuardia Act), grant employees an affirmative, substantive right to be free from interference, coercion or restraint by the employer in joining a labor union? Or, is this section purely a declaration of policy to aid the courts in interpreting the remainder of the act?

The section reads:

"In the interpretation of this act and in determining the jurisdiction and authority of the courts of the State of Washington, as such jurisdiction and authority are herein defined and limited, the public policy of the State of Washington is hereby declared as follows:

"WHEREAS, Under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protections; therefore, the following definitions of, and limitations upon, the jurisdiction and authority of the courts of the State of Washington are hereby enacted."

Before analyzing the foregoing statute, we should first explain why this controversy was not handled by the National Labor Relations Board where, seemingly, it belonged. When, in 1935, the Congress enacted the Wagner Act (29 U.S.C.A. § 151, *et seq.*), it adopted a comprehensive statute for the settlement of labor disputes affecting interstate commerce and created the NLRB to administer it (29 U.S.C.A. § 153; 49 Stat. 451); in 1947, Congress made

substantial amendments through the Taft-Hartley Act (29 U.S.C.A. § 141, *et seq.*; 61 Stat. 136). Then, in 1959, in the Labor-Management Reporting & Disclosure Act (29 U.S.C.A. § 164(c) (Cum. Supp. 1963)), Congress explicitly empowered the NLRB to do what it had assumed to do earlier under the rule-making power, *i.e.*, to decline jurisdiction in labor disputes where it believed the effect of the dispute on interstate commerce would be insufficient to warrant its exercise of jurisdiction.

Acting under this authority, the NLRB has by rule declined jurisdiction over retail establishments having less than $500,000 gross annual sales. *Carolina Supplies & Cement Co.*, 122 NLRB 88 (1958). The Regional Director, 19th Region, NLRB, has declined jurisdiction here on the ground that Esquire's gross business fell short of the jurisdictional minimum, and its activities did not otherwise substantially affect interstate commerce. The general counsel, NLRB, affirmed this decision and left this case, and others like it elsewhere involving labor-management disputes, in a kind of juridical "no man's land," particularly in those states having no state labor relations act.[1]

Although the NLRB has been expressly authorized by the Congress to cede its jurisdiction in certain cases to

---

[1]Twelve states and one commonwealth of the United States have enacted comprehensive labor relations statutes, similar to the federal labor relations act creating labor relations type boards to administer the law: Colorado, Labor Peace Act, Art. 5, chapter 80, §§ 80-5-1 to 80-5-22, Colo. Rev. Stat., 1953; Connecticut, Labor Relations Act, §§ 31-101 to 31-111, General Stat. Ann.; Hawaii, Employment Relations Act, chapter 250, Laws of 1945; Kansas, §§ 44-801 to 44-815, General Stat.; Massachusetts, State Labor Relations Law, chapter 150 A, §§ 1-12, General Laws Ann.; Minnesota, Labor Relations Act, chapter 179, Minn. Stat. of 1961; New York, State Labor Relations Act, chapter 443, Laws of 1937, as amended; North Dakota, Labor-Management Relations Act, chapter 236, Laws of 1961; Pennsylvania, Labor Relations Act, Title 43, §§ 211.1 to 211.13, Purdon's Stat. Ann.; Rhode Island, State Labor Relations Act, chapter 7, title 28, General Laws of R. I., 1956; Utah, Labor Relations Act, §§ 34-1-1 to 34-1-16, Utah Code Ann., 1953, as amended; Wisconsin, Employment Peace Act, §§ 111.01-111.19, Wis. Stat., as amended; and Puerto Rico, Labor Relations Act, Act 130, Laws of 1945, as amended.

appropriately empowered state agencies (29 U.S.C.A. 160(a)), Washington has never adopted a comprehensive labor-management relations statute or established such an agency. Thus, the no man's land persists between federal jurisdiction on the one side and the state's common-law jurisdiction on the other—vague, ill-defined and necessarily uncertain. See: McCoid, A Study of the "No Man's Land" of Labor Law, 44 Minn. L. Rev. 205 (1959).

Both parties refer to the common law's treatment of labor unions, but respondents particularly emphasize the historic development of the common law in this field to support their position. Respondents say that, under the common law, unions were not only unlawful but were held to be a criminal conspiracy which workingmen had neither the right to organize nor join, and mention so recent an enactment as RCW 49.36.010, passed in 1919, to confirm this point. The statute reads:

"It shall be lawful for working men and women to organize themselves into, or carry on labor unions for the purpose of lessening the hours of labor or increasing the wages or bettering the conditions of the members of such organizations; or carry out their legitimate purposes by any lawful means." RCW 49.36.010.

It would be pointless, say respondents, for the legislature to have adopted this statute had the rights therein granted existed at common law. Since this statute made labor unions lawful, it is argued, the right to join them became lawful, and logically this right could not be said to arise from a mere declaration of policy section in a statute otherwise clearly designed to limit the injunctive power of the courts in labor cases enacted years later.

A brief history of the law of labor unions seems not irrelevant to this problem in statutory construction, for the development of common-law rules does have a bearing on legislative meaning and so, too, does the social and economic history of the times bringing them forth. Strangely, the common law as it applied to labor unions failed to live up to its usual expectations, for though the rules seem clear enough, the reasons supporting them are hard to discern.

From 1349, when the Statute of Labourers, 23 Edw. 3, 2 Stat. 26, deprived workmen of the right to ask for higher wages because the plague had reduced the working force, on through the era of Charles Dickens, the King, Parliament and the common law viewed with unconcealed hostility every peaceful effort of the workingman to improve his lot.

We see the common-law judges, perhaps harkening to some ancient, half-forgotten statutes[2] but claiming no authority other than the common law, pronouncing, with oracular indifference to the needs of the times, the doctrine of criminal conspiracy—a curious rule which allowed an artisan to ask for better pay and working conditions but declared him a criminal if he joined two or more artisans in this otherwise lawful ambition. *The King v. Journeymen-Taylors of Cambridge*, 8 Mod. 10 (1721). Later, Lord Mansfield, in *The King v. Eccles*, 1 Leach's Crown Cases 274 (1783), "without hearing the other side" pronounced it a criminal conspiracy for six tailors to agree among themselves not to work with one H. Booth, likewise a tailor, because of his refusal to join them in a demand for higher wages. The opinion says, "so every man may work at what price he pleases, but a combination not to work under certain prices is an indictable offence" and affirms thereby a sentence imposed by the Summer Assizes for Lancaster of 6 months in the gaol at Liverpool. Thus the judges founded the common law of labor unions with rules soon to have the most frightful and degrading consequences, for power-

---

[2]The Statute of Labourers, 23 Edw. 3, 2 Stat. 26 (1349), and 25 Edw. 3, 2 Stat. 31 (1350), to check the rise in wages consequent upon the great plague called the "black death," decreed that all persons under 60, not having means to live without work, be "bounden to serve him which so shall him require," on penalty of imprisonment for refusal, and at wages to be fixed by the court, and further be required by the judges to take an oath to obey the statute.

And, further:

. . . In 1548, a statute (2 and 3 Edw. VI, c. 15) was passed forbidding under severe penalties all conspiracies of artificers, workmen or laborers, 'not to make or do their work but at certain price or rate,' . . ." Martin, The Modern Law of Labor Unions § 2 (1910).

ful and dramatic social and economic forces were soon to be loosed upon England.

These were the forces unleashed by an industrial revolution that first lured and then trapped working people by the tens of thousands into the squalid slums of England's industrial centers. Swarming into the cities in hordes to man the newly-contrived steam-driven machines, generations of men, women and children lived, worked and died in the mines and manufactories of England's expanding industrial system. They worked unbelievably long hours for a pittance under incredibly dangerous conditions. No voice bespoke the social conscience of a rapidly changing society; the King, Parliament and the common law put down even the hope of a labor organization through which the new industrial worker might raise his status from a position scarcely higher than that of a domesticated animal to the dignity of a free English workman. So, with no labor union to shield him or raise its voice for him, the English workman stood alone with his family against the terrible economic and social forces generated by the industrial revolution. Crowded into vile slums, malnourished, beset by disease, ignorant, morally deteriorated by the grinding poverty forced upon him by an economic system and legal system that had no place in its structure for the labor union, he faced the future without hope, for the common law gave him none.

As the social cancer generated by the industrial revolution spread to all of the great industrial centers in the realm, the common law stood firm and unchanged upon the fiction that the labor union constituted a criminal conspiracy; it sought to preserve complete freedom of contract for the employer by indulging the fallacy that forcing the worker to bargain with him as an individual likewise preserved freedom of contract to the employee. See: Martin, The Modern Law of Labor Unions §§ 2-15 (1910). The common-law judges saw no connection between the absence of labor organizations designed to improve the pay and working conditions and the loathsome conditions in which the industrial workingman and his family lived.

American courts gave scant heed to the common-law rules for the suppression of labor unions. Only two states of the United States seem to have accepted the curious view that a combination of workmen to raise wages constituted a criminal conspiracy. *People v. Melvin,* 2 Wheeler's Crim. Cases 262 (N. Y. 1810); *People v. Trequier,* 1 Wheeler's Crim. Cases 142 (N. Y. 1823); Philadelphia's Cordwainers' Case (Pa. 1805), reported 41 Yale L. Jour. 165 (1931). Despite dicta to the contrary, the idea that a labor union is a criminal conspiracy seems not to have taken root in this country. Witte, Early American Labor Cases, 35 Yale L. Jour. 825 (1926); Nelles, The First American Labor Case, 41 Yale L. Jour. 165 (1931). Any lingering doubts that the roots of the idea were shallow indeed, if they can be said to have taken hold at all in American law, may be put to rest by a reading of *Commonwealth v. Hunt,* 45 Mass. (4 Metcalf) 111, 38 Am. Dec. 346 (1842), a landmark in the field of labor law, and quite possibly the foundation upon which the American law of labor unions is built.

In *Commonwealth v. Hunt, supra,* the Boston Journeymen Bootmakers' Society had among its members one Jeremiah Horne who did extra work without charging his employer. As he persisted in making boots for lower pay than the rate per pair fixed by the society's bylaws, the society expelled him from membership, and refused to work for any employer who hired him. An indictment brought against Hunt and six other members of the society charging them in four separate counts with a criminal conspiracy to damage and hurt Jeremiah Horne and his employer failed to describe the means by which the conspiracy was to be carried out.

A masterful account and analysis of this case based on original research into the facts and record thereof, not set forth in the reported decision, may be read in a treatise per Nelles, 32 Colum. L. Rev. 1128 (1932), entitled *Commonwealth v. Hunt.* For our purpose, it is sufficient to say that Shaw, C. J., with great force and clarity, rejected the idea that a labor union is per se a criminal conspiracy and dismissed the indictment for legal insufficiency. He wrote:

"  . . . associations may be entered into, the object of which is to adopt measures that may have a tendency to impoverish another, that is, to diminish his gains and profits, and yet so far from being criminal or unlawful, the object may be highly meritorious and public spirited. The legality of such an association will therefore depend upon the means to be used for its accomplishment. If it is to be carried into effect by fair or honorable and lawful means, it is, to say the least, innocent; if by falsehood or force, it may be stamped with the character of conspiracy. . . . if criminal and indictable, it is so by reason of the criminal means intended to be employed for its accomplishment; and as a further legal consequence, . . . those means must be stated in the indictment. . . ." *Commonwealth v. Hunt, supra.*

Thus the court held a labor union to be a lawful and legitimate organization whose members could agree to refuse employment with one of their calling not a member and could lawfully agree among themselves to refuse employment at less than an agreed wage. It being lawful for an individual to ask for more pay, no criminal conspiracy came into existence through an agreement to do so as a group.

Since *Commonwealth v. Hunt, supra,* any serious claim that a labor union constituted a criminal conspiracy vanished from the legal scene and has never revived. We think, therefore, that RCW 49.36.010, declaring it lawful for workingmen and women to organize labor unions to lessen working hours, improve working conditions and increase wages, was but declaratory of the new American common law developed between 1842 and 1919, the year of its enactment. Accordingly, we find nothing in the history of the law relating to labor unions forcing an interpretation of § 2, the declaration of policy, that it must be treated exclusively as an aid to construction.

Even before enactment of RCW 49.36.010 in 1919, this court, in 1910, in a case not otherwise in point, by necessary implication accepted an unincorporated association of "numerous craftsmen voluntarily banded together for their mutual benefit and protection" not only as a lawful combination of workingmen, but additionally recognized it as

an entity at law having the power to own property. *Ship-wrights', Joiners' & Calkers' Ass'n, Local No. 2 v. Mitchell*, 60 Wash. 529, 111 Pac. 780. Hence, we must assume then that Laws of 1933, Ex. Ses., chapter 7, § 2, p. 10 (RCW 49.32.020) has a purpose other than to legitimize labor unions, as this had earlier been done by both the decisional law and statute. RCW 49.36.010. We assume this to be true, because we must assume that the legislature knew of the industrial revolution, the common law of England, and the newer American common law of labor unions.

Yet we are still faced with the problem of whether the little Norris-LaGuardia Act shall be deemed purely an anti-injunction statute, or whether it goes farther in purpose and confers substantive rights. Ten years earlier, this state put another anti-injunction statute on its books when it enacted Laws of 1919, chapter 185, p. 568, particularly § 2 thereof. RCW 49.36.015. This and similar statutes of other states[3] undoubtedly played an important role in influencing the Congress to pass the federal Norris-LaGuardia Act in 1932, but their legislative histories shed little light on whether substantive rights are created by them.

Extensive research has brought to light but one authority —perhaps the only one extant directly in point. In *Trustees of Wisconsin State Federation of Labor v. Simplex Shoe Mfg. Co.*, 215 Wis. 623, 256 N.W. 56 (1934), the Supreme Court of Wisconsin passed upon the meaning of the public policy section of Wisconsin's little Norris-LaGuardia Act, a section so closely resembling the declaration of policy section under inquiry here as to have the same meaning and effect. There the Simplex Shoe Manufacturing Company issued a notice to all employees that it would not recognize a labor union as its employees' bargaining agent. It warned the employees and the union that if they persisted in their plans to organize the workers it would close down. The union challenged this notice as a threat, coercive in nature, and one designed to deprive the employees of

[3]See: Anti-Injunction Laws in Labor Disputes, 35 Monthly Labor Rev. 66 (United States Department of Labor, July, 1932).

their substantive rights to be free from coercion, interference and intimidation in joining a union and acting in concert. Referring to this notice to close down, the court said:

"While much of the language contained in the statement read to the employees of the defendant at the Milwaukee plant is fair and conciliatory, some of it obviously is in the nature of a threat and amounted to an interference with the rights of the defendant's employees freely to associate, self-organize, and designate representatives of their own choosing, and amounted to a rather clear attempt to interfere, restrain, and coerce defendant's employees in the exercise of their rights."

Pointing directly to the statement of policy set forth in § 2 of the statute, the court said:

"Whether the public policy declared in sec. 268.18, Stats., bestows upon laborers any new or additional rights not already given them by the majority, if not substantially all of the courts of this country, need not be specifically considered. In our view, sec. 268.18 is a deliberate declaration by the legislature of the rights which labor shall enjoy in this state. When the legislature declared, 'it is necessary that the individual workman have full freedom of association, self-organization, and the designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection,' it intended, in our opinion, that such declaration should have the force of law. To hold otherwise would amount to saying that the legislature did not intend what it said, but merely intended to write into the statutes language pleasing to labor. We can ascribe no such motive or intention to the legislature."[4]

---

[4]*Lauf v. E. G. Shinner & Co.*, 303 U. S. 323, 82 L. Ed. 872, 58 S. Ct. 578, seems to support the idea that substantive rights flow from the policy declaration section of the Norris-LaGuardia Acts, state and federal, but the question arises in a context not strictly pertinent here.

*Trustees of Wisconsin State Federation of Labor v. Simplex Shoe Mfg. Co.*, 215 Wis. 623, 256 N.W. 56 (1934), and *Texas & New Orleans R. Co. v. Brotherhood of R. & SS. Clerks*, 281 U.S. 548, 74 L. Ed. 1034,

A few years later, passing upon this question tangentially, but referring again to the declaration of policy section in the little Norris-LaGuardia Act as affecting rights of association, self-organization and negotiation, and freedom from restraint or coercion in so doing, in *American Furniture Co. v. I.B. of T.C. & H. of A., Chauffeurs, Teamsters, & Helpers General Local No. 200 of Milwaukee,* 222 Wis. 338, 268 N.W. 250, 106 A.L.R. 335 (1936), the Supreme Court of Wisconsin said:

" . . . We are faced with the seeming contradiction that while the act contains no expressed intention to outlaw closed-shop agreements, it is expressly provided that activities of employees in the direction of association and organization for bargaining purposes shall not be subject to coercion or interference by employers. . . . "

Our research discloses no further comments on the declaration of policy by the Supreme Court of Wisconsin, but we attribute this largely to the enactment by that state in 1939 of a comprehensive labor relations statute similar in design, scope and purpose to the National Labor Relations Act, and the creation of the Employment Relations Board to administer the law. Wisconsin Laws of 1939, chapter 57; Wis. Stat. Ann., Title 13 § 111.03; 29 U.S.C.A. § 153, *et seq.* Wisconsin thus speedily erased the state-federal no man's land in the field of labor-management relationships.

Because of the surprisingly meager quantum of authority as to the effect of the declaration of policy in the little Norris-LaGuardia Act, we are compelled to look into analogous legislation. *Texas & New Orleans R. Co. v. Brotherhood of R. & SS. Clerks,* 281 U.S. 548, 74 L. Ed. 1034, 50 S. Ct. 427, covers one of the points involved here—whether substantive rights may be granted in a statute which pro-

---

50 S. Ct. 427, are cited in 37 Colum. L. Rev. 816 (1937), as authority for the following statement:

" . . . More recently, . . . the protection of the right of employees to bargain collectively free of interference by employers has been declared to be the public policy of twelve states and, although no remedy is explicitly provided, precedent is available for judicial enforcement of that right by preventing discriminatory discharges. . . . "

vides no remedy or penalty and sets up no machinery for their enforcement. Much the same situation arose under the Railway Labor Act of 1926, chapter 347, § 2; 44 Stat. 577; 45 U.S.C.A. 152 (3), *et seq.*, which declares that representatives of railway employees be selected without interference, influence or coercion. There, as here, the employer argued that such a provision conferred merely an abstract right, one not intended to be enforced by legal proceeding. On this phase of the case, the court said:

"... While an affirmative declaration of duty contained in a legislative enactment may be of imperfect obligation because not enforceable in terms, a definite statutory prohibition of conduct which would thwart the declared purpose of the legislation cannot be disregarded. The intent of Congress is clear with respect to the sort of conduct that is prohibited. 'Interference' with freedom of action and 'coercion' refer to well understood concepts of the law. The meaning of the word 'influence' in this clause may be gathered from the context. ... " *Texas & New Orleans R. Co. v. Brotherhood of R. & SS. Clerks, supra.*

And then, with reference to the section purporting to authorize the designation of representatives without interference, influence or coercion, the court continued:

"... The definite prohibition which Congress inserted in the Act can not therefore be overriden in the view that Congress intended it to be ignored. As the prohibition was appropriate to the aim of Congress, and is capable of enforcement, the conclusion must be that enforcement was contemplated.

*"The absence of penalty is not controlling. The creation of a legal right by language suitable to that end does not require for its effectiveness the imposition of statutory penalties.* Many rights are enforced for which no statutory penalties are provided. ... The right is created and the remedy exists. ... " (Italics ours.)

Turning now to our own decisions on the intended effect of the declaration of policy section in this state's little Norris-LaGuardia Act, we find that the precise points involved here have not earlier come before us, but a number of our decisions do point the way.

In *Audubon Homes, Inc. v. Spokane Bldg. & Constr. Trades Council*, 49 Wn. (2d) 145, 298 P. (2d) 1112, a case not otherwise pertinent here, we emphasized the role of the policy section as being more than an aid to construction, saying "When no such dispute is found to exist, we give paramount consideration to the anticoercion declarations of RCW 49.32.020." For indication that the declaration of policy has larger meaning than simply to aid the courts in interpreting the other sections of the act (Laws of 1933, Ex. Ses., chapter 7), see *Union Elec. & Plumbing Supply, Inc. v. United Ass'n of Journeymen & Apprentices of the Plumbing & Pipe Fitting Industry of the United States & Canada*, 45 Wn. (2d) 17, 272 P. (2d) 144; and *Ostroff v. Laundry & Dye Works Drivers' Local No. 566*, 37 Wn. (2d) 595, 225 P. (2d) 419.

In *Yakima v. Gorham*, 200 Wash. 564, 94 P. (2d) 180, we tested the validity of an anti-picketing ordinance by laying it alongside the declaration of policy section in our little Norris-LaGuardia Act. Our opinion, holding the ordinance invalid insofar as it purported to ban peaceful picketing, was based squarely on the proposition that the ordinance ran counter to the declared public policy of this state as set forth in RCW 49.32.020:

"If the foregoing legislative declarations of the public policy of the state be valid, it would hardly seem that the invalidity of ordinance No. B-301 is debatable. For it would be difficult to find two enactments of legislative bodies so directly opposite in purpose and terms as these."

The parties here cite *Blanchard v. Golden Age Brewing Co.*, 188 Wash. 396, 63 P. (2d) 397, in support of their respective but opposite positions. In that case, a dispute between the brewery workers' union and the teamsters' union—each organization having members employed by the Golden Age Brewing Company—precipitated a suit by the brewery against the brewery workers' union to enjoin a threatened strike, both unions claiming the right to organize the employees. Respondents here point to this case and the following excerpt from it referring to the little Norris-LaGuardia Act as demonstrating that the statute has no

purpose other than limiting the power of the courts to grant injunctions in labor disputes:

"From beginning to end, it breathes the spirit of limitation upon the jurisdiction of the court. . . . If the act has any purpose at all, manifestly it is to deprive the courts of the equity powers which they had customarily and rightfully been exercising."

But would not the granting of substantive rights by a declaration of policy likewise be a limitation upon the power of the courts to grant injunctions? Was not the whole act a limitation on the equity powers of the court? And may not these limitations be achieved conjointly through a grant of substantive rights and an express curtailment of judicial power? The whole concept of the federal Norris-LaGuardia Act, the parent of our state legislation, is conclusively demonstrated to be a curb on the jurisdiction thought to abide in the district courts of the United States (See: 75 Cong. Rec. 5461 (March 8, 1932)), but the broad language in the declaration of policy (29 U.S.C.A. § 102) implies that this limitation may be accomplished by both a grant of rights and a limitation of powers.

Our understanding as to the dual purpose of the act takes some substance from § 3 (RCW 49.32.030), the section purporting to outlaw "yellow-dog" contracts.

It also refers to the declaration of policy section immediately preceding it.

"Sec. 3. Any undertaking or promise, such as is described in this section, or any other undertaking or promise in conflict with the public policy declared in section 2 of this act, is hereby declared to be contrary to the public policy of the State of Washington, shall not be enforceable in any court of the State of Washington, and shall not afford any basis for the granting of legal or equitable relief by any such court, . . ." Laws of 1933, Ex. Ses., chapter 7, § 3, p. 11.

Can it be said that this section too has to do only with limiting the court's powers to grant injunction in labor disputes? Or is it not more likely that the legislature by this language enlarged upon the public policy section and granted substantive rights not spelled out or restricted to

merely making the "yellow-dog" contract unenforceable? We know of no rule of construction which compels an interpretation that this statute had but one aim. Granting that its primary purpose was to limit the court's powers in issuing injunctions in labor disputes, the language employed in §§ 2 and 3 is suitable to finding other and secondary purposes. And we believe this is implied in the *Blanchard* case, *supra,* in language referred to by the appellants, at page 409:

"According to § 2 of the act, . . . it is the public policy of this state that the worker, though he should be free to decline to associate with his fellows, should likewise have full freedom of association, self-organization and designation of representatives of his own choosing to negotiate the terms and conditions of his employment, and should be free from interference, restraint or coercion of employers of labor, *or their agents,* in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. . . ."

Perhaps the two most pertinent authorities to the narrow issue here, *i.e.,* whether the declaration of policy section (§ 2) of the little Norris-LaGuardia Act confers substantive rights, may be found in *Building Ser. Employees International Union, Local 262 v. Gazzam,* 339 U.S. 532, 94 L. Ed. 1045, 70 S. Ct. 784 (1950), on certiorari from this court, and *Ostroff v. Laundry & Dye Works Drivers' Local No. 566,* 37 Wn. (2d) 595, 225 P. (2d) 419. In *Gazzam,* referring directly to the Washington statute, the court said:

"Here, as in *Giboney* [*Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 93 L. Ed 834, 69 S. Ct. 684], the union was using its economic power with that of its allies to compel respondent to abide by union policy rather than by the declared policy of the State. That state policy guarantees workers free choice of representatives for bargaining purposes. If respondent had complied with petitioners' demands and had signed one of the tendered contracts and lived up to its terms, he would have thereby coerced his employees. The employees would have had no free choice as to whether they wished to organize or what union would be their representative.

"The public policy of Washington relied upon by the courts below to sustain this injunction is an important and widely accepted one. . . ."

In *Ostroff*, we referred directly to and quoted from *Gazzam* to emphasize the declaration of policy by setting forth, verbatim, § 2 of the act, RCW 49.32.020, saying:

"This testimony must be considered in the light of the public policy of the state of Washington, as declared by the legislature in . . . [RCW 49.32.020] reading as follows:"

The guiding rule and our major goal in an inquiry of this sort is to seek out, ascertain and give effect to the legislature's intentions (*Lynch v. Department of Labor & Industries*, 19 Wn. (2d) 802, 145 P. (2d) 265; *Graffell v. Honeysuckle*, 30 Wn. (2d) 390, 191 P. (2d) 858); and the process of attaining this goal evokes a number of familiar principles concerning problems of interpretation. If the language of the statute is plain, free from ambiguity and devoid of uncertainty, there is no room for construction because the legislative intention derives solely from the language of the statute. *State v. Houck*, 32 Wn. (2d) 681, 203 P. (2d) 693; *Shelton Hotel Co. v. Bates*, 4 Wn. (2d) 498, 104 P. (2d) 478; *State v. Spino*, 61 Wn. (2d) 246, 377 P. (2d) 868. But where the language employed conveys a doubtful or uncertain meaning, the act should be read as a whole and a meaning ascribed to it that avoids strained or absurd consequences. *Alderwood Water Dist. v. Pope & Talbot, Inc.*, 62 Wn. (2d) 319, 382 P. (2d) 639; *State ex rel. Thorp v. Devin*, 26 Wn. (2d) 333, 173 P. (2d) 994. Or, expressed otherwise, where doubt or uncertainty arises from the words used, the section under construction should be read in context with the entire act. *Hatzenbuhler v. Harrison*, 49 Wn. (2d) 691, 306 P. (2d) 745; *Behrens v. Commercial Waterway Dist. No. 1 of King Cy.*, 107 Wash. 155, 181 Pac. 892.

Reading the declaration of policy in context with § 3 which renders the so-called "yellow-dog" contracts unenforceable, and reading both of these sections in context with the entire act so as to confer substantive rights, in-

duces neither absurd nor strained consequences. And when we apply the simplest and perhaps best test for ascertaining legislative purpose, *i.e.*, the usual and ordinary meaning of the words used in the section, we have a most reliable clue to the legislature's intentions. Understood in their usual and ordinary sense, the words making up the declaration of policy, if taken to confer substantive rights, seem both relevant to and in consonance with the whole statute.

Such declarations as *"that he have full freedom of association, self-organization, and designation of representatives* of his own choosing, to negotiate the terms and conditions of his employment," and that *"he shall be free from interference, restraint, or coercion of employers of labor,"* when read in connection with language of that section and then in context with the whole act, impel us to conclude that the language is more suitable to granting of a substantive right to be free from coercion, interference or restraint on the part of the employer than merely to amplifying the remainder of the statute.

Respondents, remembering well the coercive and discriminatory practices aimed at them because of their oriental ancestry, and thus understandably harboring sentiments of ill will towards the labor union for more than a decade, undoubtedly feel morally justified in their attitude. But they should realize that this state has sought to alleviate those coercive and discriminatory practices based on race, color or creed (Laws of 1957, chapter 37, p. 107; RCW chapter 49.60), and may one day adopt a comprehensive labor relations statute designed to deal with similar coercive, discriminatory and unfair practices arising out of the relationships between management and labor. Even though this should never come to pass, the courts ought not balance the equities between the parties in construing a statute by allowing a credit, so to speak, to one party for past injustices suffered.

We reach our conclusion then in the sure knowledge that two wrongs do not make a right and that respondents' actions in discharging their employees because of their

membership in and activities for a labor union contravene the expressly declared public policy of this state.

In coming to this conclusion, we are aware that an employer, in the absence of statute or contract to the contrary, may hire and fire at will and may possibly ascribe reasons other than union activity for discharging an employee, but we must and do consider this case on the facts presented, *i.e.*, discharges from employment because of participation in labor union activities.

It follows, then, and we therefore conclude that Laws of 1933, Ex. Ses., chapter 7, § 2, p. 10 (RCW 49.32.020), the little Norris-LaGuardia Act, in expressly declaring the public policy of this state, conferred actionable rights on employees, among which rights were that they be free from coercion, interference and restraint from and by their employers in organizing or joining a labor union and in designating such union as their agent for collective bargaining.

Accordingly, the judgment is reversed and the case remanded with instructions that hearing be had to determine the damages, if any, proximately resulting from the wrongful termination of employment; that an order of reinstatement to employment issue; and that the respondents be enjoined from interfering with, restraining, or in any way coercing the appellants from joining a labor union or designating it as their agent for collective bargaining.

ROSELLINI, C. J., DONWORTH, FINLEY, HUNTER, and HAMILTON, JJ., concur.

HILL, J. (dissenting)—I deem the result of the majority opinion desirable, but I regretfully dissent because of my conviction that the court is again legislating—skillfully, graciously, and in a righteous cause, but nonetheless legislating.

At the time the superior court entered the judgment, dismissing the action by David Lau's discharged employees, it had no alternative if it applied the then law of this state.

It was then clearly established that, in the absence of a contract of employment for a specific period or applicable legislation, either the employer or the employee could terminate the employment at will. *Lasser v. Grunbaum Bros.*

*Furniture* Co. (1955), 46 Wn. (2d) 408, 281 P. (2d) 832; *Rohda v. Boen* (1945), 45 Wn. (2d) 553, 276 P. (2d) 586; *Davidson v. Mackall-Paine Veneer Co.* (1928), 149 Wash. 685, 271 Pac. 878.

The trial court applied that rule and held that Mr. Lau could discharge his employees at will. Concededly, absent any contractural or legislative restriction, that would be true.

The majority reverses the trial court, saying that there is a legislative restriction which prohibits discharging a person because of membership in a union.

If there were such a statute, it need only be pointed out in a very brief opinion. Two score and more pages are required to explain why RCW 49.32.020, set out in full on page 4 of the majority opinion, accomplishes the same purpose as the labor-management laws of other states.

Quite properly, collective bargaining agreements, civil service legislation, and anti-discrimination statutes have greatly limited the freedom of employers, both private and public, to hire and fire at will. In the vast domain covered by the federal-labor-management legislation, the jurisdiction of the federal agencies and courts is exclusive.

State-labor-management acts in many states have further limited the rights of employers and have specifically made unlawful the discharge of an employee because of his or her union membership or activity. The usual format of such legislation is, in one section, to state that employees shall have the right to form, join, or assist labor organizations; and, then, to provide in a succeeding section that it shall be an unfair labor practice for an employer individually or in concert with others to interfere with, restrain, or coerce his employees in the exercise of the rights guaranteed in the preceding section.[5]

---

[5]For a partial list of the states using this format in labor-management legislation see Colo. Rev. Stat. (1953), §§ 80-5-4, 80-5-6(1) (a); Revised Laws of Hawaii (1955), §§ 90-5, 90-7(a); Gen. Stat. of Kansas (1949), §§ 44-803, 44-808(1); Mass. Gen. Laws Ann. (1959), chapter 150A, §§ 3, 4(1); Minn. Stat. (1961), §§ 179.10, 179.12(3); North Dakota Century Code Ann. (Supp. 1963), §§ 34-12-02, 34-12-03(a); Purdon's

This is as it should be—a legislative enactment, direct and unmistakably clear to employers and employees rather than an inference and a conclusion tortured out of a section which is no more than a declaration of policy in a statute dealing with injunctions in labor disputes.

This matter of how to limit an employer's right to discharge at will, so as to protect an employee's right to join a union and be active in it, is one to be handled by the legislature prospectively, and not by the court retroactively.

I would affirm the trial court because it properly applied the law as it existed at the time the plaintiffs were discharged by Mr. Lau and at the time of trial. The law will be changed only when this opinion becomes effective, and then retroactively to the benefit of the plaintiffs and to the detriment of Mr. Lau.

WEAVER and OTT, JJ., concur with HILL, J.

April 23, 1965. Petition for rehearing denied.

Penn. Stat. Ann. (1950), Labor §§ 211.5, 211.6(a); Utah Code Ann. (1953), §§ 34-1-7, 34-1-8(a); Wis. Stat. Ann. (1957), §§ 111.04, 111.06(a). See also Laws of Puerto Rico Ann. (1955), Labor §§ 65, 69(1) (a).
Same effect,. different format: Conn. Gen. Stat. Ann. (1958), §§ 31-104, 31-105(4) (5); McKinney's Consolidated Laws of New York Ann. (1948), Labor §§ 703, 704(4) (5); Gen. Laws of Rhode Island (1957), §§ 28-7-12, 28-7-13(4) (5).