[No. 235-41064-1.     Division One.     May 11, 1970.]
Panel 1

GEORGE F. McDERMOTT, *Appellant,* v. STANLEY KACZMAREK *et al., Respondents.*

*Richard G. McCann,* for appellant.

*J. R. Woolston,* for respondents.

JAMES, C. J.—George McDermott's 7-year-old son Perry went, uninvited, to play on the Thomsons' land. While playing with two companions near the top of a cliff, Perry fell to his death. McDermott's wrongful death action against the Thomsons was dismissed on their motion for summary judgment. McDermott appeals.

The facts are not in dispute. The trial judge concluded that under no legal theory could McDermott prevail.

McDermott's two legal theories are these: that the Thomsons' failure to fence their property pursuant to RCW 78.12.010 was negligence as a matter of law and that the Thomsons were negligent in maintaining an "attractive nuisance" on their land.

The Thomsons' land is unimproved. It fronts on the same street as McDermott's home, which is nearby. About 30 years ago rock was quarried from the Thomsons' land by one of their predecessors in interest. The quarry operation left an exposed, rocky cliff approximately 40 feet high. The base of the cliff is at the level of the street on which McDermott's home is located. The contour of the cliff is

generally concave, opening onto the street roughly in the form of a bowl. The presence of the cliff is apparent from all directions. The parties agree that the two photographs reproduced with this opinion accurately portray the areas as it was at the time of the tragedy.

Perry was a trespasser. The Thomsons would ordinarily owe him only the duty to refrain from willfully or won-

tonly injuring him. *See Mail v. M. R. Smith Lumber & Shingle Co.,* 47 Wn.2d 447, 287 P.2d 877 (1955). McDermott must rely upon exceptions to this basic rule.

In support of his first theory, McDermott relies upon RCW 78.12.010:

Any person or persons, company, or corporation who shall hereafter dig, sink or excavate, or cause the same to

be done, or being the owner or owners, or in the possession, under any lease or contract, of any shaft, excavation or hole, whether used for mining or otherwise, or whether dug, sunk or excavated for the purpose of mining, to obtain water, or for any other purpose, within this state, shall, during the time they may be employed in digging, sinking or excavating, or after they have ceased work upon or abandoned the same, erect, or cause to be erected, good and substantial fences or other safeguards, and keep the same in good repair around such works or shafts sufficient to securely guard against danger to persons and animals from falling into such shafts or excavations.

It is McDermott's position that the statute applies to the Thomsons' rock quarry and that under the statutory provisions, the Thomsons were required to surround the quarry with a protective fence.

The statute was enacted during the 1889-1890 legislative session. It was entitled "Fencing of Mines and Shafts" and designated "An Act to secure persons and animals from danger arising from mining." Although we agree with McDermott that in a general dictionary sense a "quarry" can be a "mine," we are satisfied that RCW 78.12.010 does not apply to the Thomsons' abandoned rock quarry.

If McDermott is to prevail on his first theory, it must be because the exposed face of the Thomsons' quarry is an "excavation" within the meaning of the statute. We find that the word "excavation" does create some uncertainty as to the scope of the statute. In resolving this ambiguity, we resort to the usual rules of statutory construction.

■ The primary rule of statutory construction is that courts must ascertain and declare the intention of the legislature. *Krystad v. Lau*, 65 Wn.2d 827, 400 P.2d 72 (1965); *see generally* 50 Am. Jur. *Statutes* § 223 (1944). The intent must be determined primarily from the language of the statute itself. Words must be given their commonly understood meaning if possible. *See generally* 50 Am. Jur. *Statutes* § 238 (1944). Where, as here, there is uncertainty, we must resort to other recognized rules of statutory construction. *Krystad v. Lau, supra.*

■ Inasmuch as the statute creates a duty and a corresponding right where none existed at common law, it must be strictly construed. In other words, the duty imposed must be precisely limited to that intended by the legislature.

In this state there is also a general statute, Rem. Comp. Stat., § 143 [P. C. § 8252], which is pertinent. It provides:

"The common law, so far as it is not inconsistent with the constitution and laws of the United States, or of the state of Washington, nor incompatible with the institutions and condition of society in this state, shall be the rule of decision in all the courts of this state."

We have held that any law in derogation of the common law should be strictly construed. [Citations.]

*In re Estate of Tyler,* 140 Wash. 679, 684, 250 P. 456, 51 A.L.R. 1088 (1926).

■ Two additional rules of statutory construction apply. The doctrine of noscitur a sociis is that

the meaning of particular terms in a statute may be ascertained by reference to words associated with them in the statute. Where two or more words of analogous meaning are employed together in a statute, they are understood to be used in their cognate sense, to express the same relations and give color and expression to each other. It is also a familiar policy in the construction of terms of a statute to take into consideration the meaning naturally attaching to them from the context, and to adopt that sense of the words which best harmonizes with the context.

(Footnotes omitted.) 50 Am. Jur. *Statutes* § 247 (1944).

The doctrine of ejusdem generis is that

General and specific words in a statute which are associated together, and which are capable of an analogous meaning, take color from each other, so that the general words are restricted to a sense analogous to the less general. . . . The general words are deemed to have been used, not to the wide extent which they might bear if standing alone, but as related to words of more definite and particular meaning with which they are associated.

(Footnotes omitted.) 50 Am. Jur. *Statutes* § 249 (1944).

We note that the following critical words were juxta-

posed in the statute: "dig, sink or excavate;" "shaft, excavation or hole;" "dug, sunk or excavated;" "digging, sinking or excavation;" and "such works or shafts."

■ Applying the companion doctrines of noscitur a sociis and ejusdem generis, we conclude that the potential breadth of the word "excavate" must be limited by the words "shaft" and "hole."

The statute upon which McDermott relies, RCW 78.12.010, was construed in *Dernac v. Pacific Coast Coal Co.*, 110 Wash. 138, 188 P. 15 (1920). There the court considered the meaning of the words "falling into said shaft or excavation." Although the ruling in *Dernac* is not determinative of the issue in this case, we note the following language, which we consider to be instructive and consistent with the construction we give the word "excavation: "

> In [interpreting the statute], it is proper to have in mind the evils which the passage of the statute were intended to remedy. Unguarded excavations on private property were a source of danger, and *unless some warning of their existence or safeguards were afforded* they were constant menaces to the lives and limbs of *persons using the property and unaware of their existence.* This is especially true in mining districts, and on this account the statute was passed in this state, and similar statutes have been passed in other states where mining operations are carried on. In view of the language of this statute and the dangerous results which were sought to be prevented, it cannot be said that the statute means, when it says that the guards are for the purpose of preventing the "falling" of persons into excavations, that thereby tunnels and slopes should have been so guarded that no one could walk into them. It might have been that the legislature could have made it obligatory upon mining companies to guard against accidents from other sources as well as "falling." The deceased having voluntarily walked into the passageway, cannot be said to have "fallen" into it; nor was the passageway of such character as to make it possible for him to "fall" into it. *The purpose of the law was to prevent an involuntary entrance into a "shaft, excavation or hole."*
>
> . . .

Furthermore, this statute creates a right where none existed at common law, and will be strictly construed

when determining the persons who are entitled to benefit thereby.

(Italics ours.) *Dernac* at 140.

Similar statutes have been considered in other jurisdictions. Not all courts are in agreement with our holding here. *See, e.g., Perry v. Tonopah Mining Co.*, 13 F.2d 865 (Nev. 1915). We find, however, substantial agreement with our conclusion that the word "excavation" was used to describe a hole or shaft and not an expansive, open quarry. A similar conclusion was reached by the Supreme Court of Nevada in a case dealing with a statute identical to ours.

What effect should be given the phrase "around such works or shafts," as used in the statute, in determining the meaning of the word "excavation?"

. . .

. . . The obvious application of the phrase "around such works or shafts," in view of the context, and the meaning of the words "works" and "shafts," was that it related to shafts, holes and similar excavations of the pit type—the kind of excavations which is meant by the ordinary or popular definition in the dictionaries, as distinguished from the technical or scientific definition. It is necessary to fence "around" such excavations to prevent the danger of falling into them, and the area of such openings on the surface being comparatively small, they may be fenced without great expense. . . . To attempt to extend the application of the said phrase to excavations such as ditches, would be to give it a wholly unreasonable, uneconomic, and artificial application, as above indicated, solely for the purpose of bolstering a construction of the meaning of the word "excavations" according to the scientific or engineering meaning, which, in view of the context, would be likewise artificial, incongruous and inconsistent with the limitation indicated by said phrase "around such works or shafts."

*Orr Ditch & Water Co. v. Justice Court*, 64 Nev. 138, 150, 178 P.2d 558 (1947). We conclude that RCW 78.12.010 does not require the Thomsons to fence their abandoned rock quarry and hold that they were therefore not negligent as a matter of law for failing to do so.

The attractive nuisance doctrine is an exception to the general rule which defines a land possessor's duties with respect to trespassers. This state has applied the doctrine on a case-by-case basis since first adopting it in *Ilwaco Ry. & Nav. Co. v. Hedrick,* 1 Wash. 446, 25 P. 335 (1890). *See generally* 43 Wash. L. Rev. 867 (1968); Comment, *The Attractive Nuisance Doctrine in Washington,* 22 Wash. L. Rev. 45 (1947). In the leading case of *Schock v. Ringling Bros. & Barnum & Bailey Combined Shows,* 5 Wn.2d 599, 105 P.2d 838 (1940), Mr. Justice Steinert carefully reviewed the court's earlier cases and extracted from them the essential elements of the doctrine. They are five in number, and all must be present if the doctrine is to be applied:

(1) the instrumentality or condition must be dangerous in itself, that is, it must be an agency which is likely to, or probably will, result in injury to those attracted by, and coming in contact with, it; (2) it must be attractive and alluring, or enticing, to young children; (3) the children must have been incapable, by reason of their youth, of comprehending the danger involved; (4) the instrumentality or condition must have been left unguarded and exposed at a place where children of tender years are accustomed to resort, or where it is reasonably to be expected that they will resort, for play or amusement, or for the gratification of youthful curiosity; and (5) it must have been reasonably practicable and feasible either to prevent access to the instrumentality or condition, or else to render it innocuous, without obstructing any reasonable purpose or use for which it was intended.

*Schock* at 616.

The trial judge's ruling granting the motion for summary judgment was based on the only cognizable evidence offered, the photographs reproduced with this opinion and the testimony McDermott gave at his deposition. If there is evidence or reasonable inferences to be drawn from the evidence to present a factual question concerning any of the five elements, it must be found in the exhibits and in McDermott's testimony.

Unquestionably there is evidence which presents a question of fact as to elements 2 and 4. The cliff on the Thom-

son's land was exposed and unguarded, and it could reasonably be expected that children would be tempted to climb it.

Apparently the fifth element has never been further discussed by the Supreme Court of this state. *See* 43 Wash. L. Rev. 872 (1968). However, we note that Professor Prosser finds this element to be generally recognized.

> The public interest in the free use of land is such that, in general, he will not be required to take precautions which are so burdensome or expensive as to be unreasonable in the light of the risk, or to make his premises **"child-proof."**

(Footnotes omitted.) W. Prosser, Torts § 59 (3d ed. 1964).

The evidence presents a question of fact as to whether or not fencing was feasible to prevent access to the quarry.

We find, however, no evidence or reasonable inference therefrom which could establish elements 1 or 3.

■ In *Barnhart v. Chicago M., & St. P. Ry.*, 89 Wash. 304, 154 P. 441 (1916) an 8-year-old boy was drowned while at play in a pond which had been formed as a result of the construction of defendant's railroad embankment. In refusing to apply the doctrine of attractive nuisance, the court said,

> The question here presented is . . . whether a pond of water is a dangerous agency such as will subject the owner of the property to liability for damages for the death of a child of tender years attracted to the pond for the purpose of play. The turntable doctrine makes the owner liable because the dangerous agency was attractive to children of tender years, and in playing about or with such agency, accident or injury would probably result.
>
> That a pond of water is attractive to boys for the purposes of play, swimming, and fishing, no one will deny. But its being an attractive agency is not sufficient to subject the owner to liability. It must be an agency such as is likely to, or will probably result in, injury to those attracted to it. That many boys every year lose their lives by drowning is a matter of common knowledge. But the number of deaths in comparison to the total number of boys that visit ponds, lakes, or streams for purposes of play, swimming, and fishing, is comparatively small. It would be extending the doctrine too far to

hold that a pond of water is an attractive nuisance, and therefore comes within the turntable cases.

*Barnhart* at 306.

Even though the topography of the Thomsons' land was the result of a quarry operation, the terrain does not differ in any significant way from countless natural formations throughout Western Washington.

It is the weight of authority that a *natural* watercourse is not an attractive nuisance, and that an artificial one is not if it has natural characteristics. As was said in *Somerfield v. Land & Power Co.*, 93 Kan. 762, 145 Pac. 893:

"The canal, as will be observed, has the characteristics of a natural stream and can no more be regarded as an attractive nuisance than would a river flowing through the city or a pond or lake therein."

*Meyer v. General Elec. Co.*, 46 Wn.2d 251, 253, 280 P.2d 257 (1955). Both ponds and cliffs are attractive to boys. Boys can be injured or even lose their lives playing on a pond or climbing a cliff. But as *Barnhart* holds, a pond is not an inherently dangerous condition; it is not *probable* that a boy who plays on a pond will drown. Nor is it *probable* that a boy playing near an exposed cliff will fall to his death. There was no evidence upon which the trier of fact could find that element No. 1 was established. *Accord, Holland v. Niemi*, 55 Wn.2d 85, 345 P.2d 1106 (1959); *Mail v. M. R. Smith Lumber & Shingle Co.*, 47 Wn.2d 447, 287 P.2d 877 (1955).[1]

---

[1]Although the Washington Supreme Court has expressly reiterated its adherence to the requirement that element No. 1 be established, that requirement has been criticized. *See* Comment, *The Attractive Nuisance Doctrine in Washington*, 22 Wash. L. Rev. 45, 49 (1947), in which the following criticism was made:

[A] closer examination of the rules in the *Schock* case discloses that some of them are so ambiguous as to be practically meaningless. For example, "The instrumentality . . . must be dangerous in itself." When is a thing dangerous? Only when it is improperly used—even dynamite is not dangerous if sitting by itself in the middle of a desert. It is doubtful that the court meant to say that the doctrine should be applied only to such things as are usually classified in the law as "inherently dangerous" (firearms, dynamite caps, electric power), for previous Washington cases had made no

■ In one of life's earliest lessons, a child learns that the law of gravity applies indiscriminately. Even before his first step, a toddler begins his lifelong accommodation to nature's pervading and inexorable force.

No danger is more commonly realized or risk appreciated, even by children, than that of falling; consciousness of the force of gravity results almost from animal instinct. Certainly a normal child nearly seven years of age—indeed any child old enough to be allowed at large —knows that if it steps or slips from a tree, a fence, or other elevated structure, it will fall to the ground and be hurt. It may be that some children, while realizing the danger, will disregard it out of a spirit of bravado, or because, to use the language of the Restatement, of their "immature reckless", but the possessor of land is not to be visited with responsibility for accidents due to this trait of children of the more venturesome type.

*McHugh v. Reading Co.*, 346 Pa. 266, 269, 30 A.2d 122, 145 A.L.R. 319 (1943).

The ruling in *Heva v. Seattle School Dist. 1*, 110 Wash. 668, 672, 188 P. 776, 9 A.L.R. 267 (1920) was made on the basis that the third element in *Schock* had not been established.

Ladders are nearly as common as fences and trees, and to hold that a jury might find an ordinary ladder to be an attractive nuisance, under the doctrine of the turntable cases, would be to require every property owner having a fence or tree accessible to children at play to maintain a constant guard about them. Common objects, the uses and dangers of which are obvious and well known, at

such restriction. It is more likely that the court intended by this requirement to put outside the scope of the doctrine such articles as "swings, teeter boards, lumber piles, fences, gates, walls, buildings, trees . . ." but if such be the meaning, the phraseology of the rule leaves much to be desired.
(Footnotes omitted.)

The Restatement (Second) of Torts § 339 (1965) does not include Washington's element No. 1 as a requirement. The Restatement's comparable element is this:

(b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, . . .

least to the normal child of twelve years, and which cannot be made inaccessible without destroying the purpose for which they exist, may not, under the law as established in this state, be found to be attractive nuisances simply because injury from their use has occurred to a licensee or trespasser of sufficient age and understanding to appreciate the danger.

McDermott testified that he had frequently warned Perry of the danger of playing near the cliff and had spanked him for disobeying his orders to stay away from the quarry. A normal child of 7 years has learned to appreciate fully the danger of falling. No reasonable issue of fact was created in this case concerning the third element of *Schock*.

The Thomsons were not the insurers of Perry's safety. *Engdal v. Owl Drug Co.*, 183 Wash. 100, 48 P.2d 232 (1935). Even to an invitee there is no duty to warn of dangers known to him or which are so apparent that he may reasonably be expected to discover them. W. Prosser, Torts § 61 (3d ed. 1964).

As previously noted, Perry was aware of the danger. He had been punished for playing in the area. Even without the warning he was old enough to appreciate the danger. We find no genuine issue of fact or reasonable inference from the facts which requires the submission of either of McDermott's theories to the trier of fact.

The judgment is affirmed.

FARRIS and SWANSON, JJ., concur.