[No. 6240-1. Division One. September 17, 1979.]

JULIE MALONE, *Appellant*, v. THE CITY OF SEATTLE, *Respondent*.

*Karr, Tuttle, Koch, Campbell, Mawer & Morrow, P.S., Craig P. Campbell, James R. Hermsen, and Philip A. Talmadge,* for appellant.

*Douglas N. Jewett, City Attorney, J. Roger Nowell, Assistant, Lane, Powell, Moss & Miller,* and *Robert L. Israel,* for respondent.

CALLOW, C.J.—The plaintiff, Julie Malone, appeals from a jury verdict in favor of the defendant, the City of Seattle, upon its determination that the defendant was not negligent in providing care to the plaintiff following an automobile accident in which she was injured. The plaintiff contends that the trial court wrongfully instructed the jury regarding a 1971 statute that granted civil immunity from

actions based upon a paramedic's rendition of emergency lifesaving service to a person in immediate danger of loss of life.

At approximately 1:45 a.m. on March 9, 1974, Julie Malone, a minor, Tom Day, and another male left the Embers Tavern in West Seattle to go to a party. Miss Malone entered Day's 1961 Austin–Healey automobile and sat in the rear compartment of the vehicle with her legs protruding forward into the front passenger compartment between the two bucket seats.

Shortly thereafter, the car struck a telephone pole after skidding on wet roadway. A Seattle Fire Department aid car was summoned to the scene at approximately 2:20 a.m. Medic unit Aid 10, to which firefighters/paramedics Gunther Hausman and Gerald Garrett were assigned, arrived at the scene 15 minutes later.

Mr. Hausman was advised by a paramedic trainee that Miss Malone was believed to have sustained a back injury and that she was still in the automobile. Mr. Hausman observed that she was in a twisted position, wedged between two seats with part of her upper body in the back area behind the seat and her lower extremities still in the front seat. Someone stated that they thought they heard crepitus, the sound created by bone grating together. Her neck was bruised and she was unconscious; her breathing and pulse rate were normal.

Mr. Hausman treated the plaintiff for a possible spinal injury by applying a cervical collar. She was then placed on a backboard to minimize the possibility of dislocation of vertebrae that might have been broken in the accident. A 1–inch–wide tape was attached over her chin and another was attached over her forehead to the edge of the backboard to restrain head motion. Two–inch–wide nylon straps were placed over her chest and across her thighs to further restrain movement. She was placed inside Aid 10 atop a stretcher.

Once inside the vehicle, Mr. Hausman released the chest and thigh restraint straps. He then further examined her to

determine if there were any neck injuries, establish a pulse rate and breathing, and to look for flexion and broken bones, bruises and bleeding. Her clothes were removed and Mr. Hausman noted bruises on her side, chest, abdomen, and neck. A doctor at Harborview Medical Center was contacted and told that Miss Malone had only minor bruises and no obvious fractures.

Mr. Hausman then placed straps from the stretcher over Miss Malone's chest and just above her knees. The straps were tightened sufficiently so that she would not be jostled on the way to the hospital; her head was still secured to the backboard by tape. The aid car then proceeded slowly to Harborview Hospital in order not to increase her injuries.

En route to the hospital, Miss Malone awoke and started to moan; she had been unconscious for about 45 minutes. Mr. Hausman told her to remain still so that she would not make matters worse. However, she attempted to sit up, and Mr. Hausman put his hands on her shoulders to restrain her. The tape around her head came loose and she sat up. Medic Garrett stopped the aid car and he and Hausman had to force her back on the board to restrain her. Miss Malone's hands then were taped to the side rails of the stretcher so she could not pull herself up. Mr. Hausman saw that her body had moved, and he stated that he believed that her movements were purposeful, not involuntary, and that she was trying to escape. The following day Mr. Hausman learned that Miss Malone was paralyzed. This surprised him because he felt that she had had complete control of her body when he had last seen her.

Julie Malone filed a claim for damages against the City of Seattle on February 6, 1976, alleging that the automobile accident occurred as the result of the placement of the utility pole 11 inches from the traveled portion of the curved roadway, and that her paralysis was caused by the collision with the telephone pole. During the course of the trial, the defendant sought to introduce the testimony of Mr. Hausman with respect to Miss Malone's movement and combativeness in the aid car to show that her quadriplegia was not

immediate but resulted from her own movements. Plaintiff then moved to amend her complaint to allege paramedic negligence, the motion was granted, and the trial proceeded on the issue of paramedic negligence.

The plaintiff sought an instruction relating to the duty of paramedics and the standard for paramedic negligence. The defendant sought instructions that incorporated a paramedic civil immunity statute and RCW 4.24.300, the "Good Samaritan Act." The trial court adopted the plaintiff's instruction as to a paramedic's duty and the defendant's instruction as to the paramedic civil immunity statute. The plaintiff specifically excepted to the giving of the defendant's instruction on the ground that the statute did not apply. The jury found that the City was not negligent in the manner in which it provided care to the plaintiff.

The following issues are raised on this appeal:

1. Did the legislature intend Laws of 1971, 1st Ex. Sess., ch. 305, § 3, p. 1783 to apply only to a physician's trained mobile intensive care paramedic's rendition of cardiopulmonary emergency treatment?

2. Was there substantial evidence to justify the giving of the defendant's instruction?

> *Did the legislature intend Laws of 1971, 1st Ex. Sess., ch. 305, § 3, p. 1783 to apply only to a physician's trained mobile intensive care paramedic's rendition of cardiopulmonary emergency treatment?*

Laws of 1971, 1st Ex. Sess., ch. 305, § 3, p. 1783, which shall hereafter be referred to as the Paramedic Civil Immunity Act, provides in part as follows:[1]

> No act or omission of any physician's trained mobile intensive care paramedic, . . . done or omitted in good faith while rendering emergency lifesaving service . . . to a person who is in immediate danger of loss of life shall impose any liability upon the trained mobile intensive

---

[1]Laws of 1971, 1st Ex. Sess., ch. 305, §§ 2-3 were substantially amended by the legislature in 1977. RCW 18.71.200-.210. The defendant stipulates for the purpose of this appeal only that the 1971 act applies to this case.

care paramedic, . . . or upon a . . . city or other local governmental unit . . .

The trial court informed the jury as to the existence of this statute and then set forth its language.[2] The plaintiff contends that this statute has no application to the facts of this case because it only applies to the rendition by a paramedic of cardiopulmonary emergency treatment. We disagree.

██ Legislative intent is to be found in the plain language of the statute. Courts may look beyond the words of the statute only if an ambiguity is present. *Schneider v. Forcier,* 67 Wn.2d 161, 164, 406 P.2d 935 (1965); *State v. Scherck,* 9 Wn. App. 792, 796, 514 P.2d 1393 (1973). The Paramedic Civil Immunity Act clearly and unambiguously states that no liability shall be occasioned by the good faith rendition of "emergency lifesaving service" by a paramedic. The plaintiff argues that the act's definition of a "physician's trained mobile intensive care paramedic"[3] qualifies, and thereby circumscribes, the situational meaning of

---

[2]The instructions read:

"It is the duty of one who undertakes to perform the service of a trained medical technician to have the knowledge and skill ordinarily possessed and to exercise the care and skill ordinarily used in like cases by trained and skilled medical technicians in the same or similar locality and under similar circumstances.

"Failure to fulfill either of these duties is negligence." Instruction No. 25.

"A statute of the State of Washington provides in part as follows:

'No act or omission of any physician's trained mobile intensive care paramedic, . . . done or omitted in good faith while rendering emergency lifesaving service to a person who is in immediate danger of loss of life shall impose any liability upon the trained mobile intensive care paramedic, . . . or upon a . . . city or other local governmental unit.'"

Instruction No. 27.

[3]Laws of 1971, 1st Ex. Sess., ch. 305, § 2, provided in part:

"'[P]hysician's trained mobile intensive care paramedic' means a person who:

"(1) has successfully completed an advanced first aid course equivalent to the advanced industrial first aid course prescribed by the Division of Safety, Department of Labor and Industries; and

"(2) is trained by a licensed physician:

"(a) to carry out all phases of cardio–pulmonary resuscitation;

"(b) to administer drugs under written or oral authorization of a licensed physician; and

"emergency lifesaving service." While the definition places special emphasis upon the paramedic's training in all aspects in cardiopulmonary resuscitation, the act does not limit a paramedic's authority to act in situations involving other than cardiopulmonary resuscitation. The act implicitly recognizes that the paramedics may encounter a variety of emergencies. The statute's grant of immunity includes all those acts which can fall within the term "emergency lifesaving service." When the Paramedic Civil Immunity Act is read as a whole, the legislature's intent is clear and unambiguous. *Krystad v. Lau,* 65 Wn.2d 827, 844, 400 P.2d 72 (1965). The determination whether a paramedic rendered emergency lifesaving service to a person in immediate danger of loss of life was for the trier of the facts.

*Was there substantial evidence to support giving the instruction?*

The plaintiff argues that substantial evidence is not present in the record to support the giving of an instruction utilizing the language of the Paramedic Civil Immunity Act. The plaintiff places great emphasis upon the paramedic's belief that Julie Malone was not in immediate peril of loss of life. However, this determination was up to the jury. Substantial testimony supported the trial court's giving the instruction. A doctor called as an expert witness testified that the plaintiff was not in a life–threatening situation if she was appropriately immobilized. On the other hand, one of the plaintiff's treating physicians testified that Miss Malone was in a life–threatening situation when the paramedics responded to her. An orthopedic surgeon also said that she was in a life–threatening situation, but he would not state whether she was in immediate danger of loss of

---

"(c) to administer intravenous solutions under written or oral authorization of a licensed physician; and

"(3) has been examined and certified as a physician's trained mobile intensive care paramedic by a county health officer or by the University of Washington's School of Medicine or by their designated representatives."

life. The chief of the orthopedic staff at Harborview Hospital testified:

What [the paramedic] knew at the time was somewheres like that she had a cervical spine injury and if that occurs as high as C–4 it will get to the phrenic nerve which stops breathing which is, obviously, life–threatening. I think there is no question . . . that a paramedic is at a life–threatening situation; she could, at any moment, have progressive swelling in the [spinal] cord and stop breathing and he would have to institute life–supportive measures.

The evidence presented created an issue for resolution by the jury and supported the giving of an instruction to guide their deliberations.

In view of our holding that the instructions given were proper and that substantial evidence supported the giving of those instructions, we need not reach the issue raised by the respondent.

The judgment is affirmed.

FARRIS and RINGOLD, JJ., concur.

Reconsideration denied November 29, 1979.

Review denied by Supreme Court February 15, 1980.