[No. 28526. *En Banc.* June 12, 1942.]

LELAND HELLAND, *Respondent,* v. RUFUS H. ARLAND *et al., Appellants.*[1]

*Skeel, McKelvy, Henke, Evenson & Uhlmann* and *Frank Hunter,* for appellants.

*Hogan & Adams,* for respondent.

BLAKE, J.—Plaintiff brought this action to recover damages on account of the death of his five-year-old

[1]Reported in 126 P. (2d) 594:

daughter, who died of injuries sustained when she was run over by a milk truck belonging to defendants. The truck was being driven by one Brown, who, at the time, was in the employ of defendants and acting within the scope of his employment. The cause was tried to a jury, which returned a verdict in favor of plaintiff. From judgment on the verdict, defendants appeal.

The accident occurred on north Rogers street, in Aberdeen. Brown was a relief driver, but had covered the route several times before and knew that children of the neighborhood were in the habit of playing about and climbing on the truck when the driver stopped to make deliveries of milk. The body of the truck was specially built for delivering milk. Immediately back of the cab, the sides were open from the floor to the top of the body. There were panels extending from floor to top opposite the rear wheels. Behind these panels, the truck was open at sides and rear from floor to top. There was a window in the rear of the cab from which the driver could see clear through the truck.

On the day of the accident, Brown's wife was with him. Concerning the events immediately prior to, and at the time of, the accident, he testified that three children, Marlene, the daughter of respondent, and two others, age five and three, respectively, came up to the truck and asked for orange juice. After making his delivery of milk, he told the children to get out of the way, "and they got off the truck, and got back out of the way." He then got in the truck, marked up his book, and asked his wife if "everything was clear on her side." She said, "Yes." He looked "out the rear glass" and then opened the door and looked. "I looked to see if I could see anyone. I could see these kids be-

hind the truck, *but I didn't see this particular one.*"
Then he started up in low gear. When he had gone a
few feet, he heard a scream. He stopped and, going
behind the truck, found Marlene lying on the ground.
She had either jumped or fallen from the left side of
the truck and under the left rear wheel, which passed
over her body.

The questions raised on the appeal go to the
sufficiency of the evidence to sustain the verdict. Ap-
pellants take the position that the child was a tres-
passer or, at best, a licensee, to whom the driver of
the truck owed the duty only of refraining from will-
ful or wanton injury. The rule of law relied on is uni-
versally applied to licensees and trespassers. And, it
may be that most courts apply the rule to cases of very
small children. But some few courts, among which is
ours, have repudiated the idea that a child as young
as Marlene can be in any real sense a trespasser. In
*Bjork v. Tacoma,* 76 Wash. 225, 135 Pac. 1005, 48 L. R.
A. (N. S.) 331, Judge Ellis said:

"That the child, a mere baby, was a technical tres-
passer or at most a mere licensee is an immaterial cir-
cumstance. A child, attracted to premises open and
unguarded in a populous neighborhood by things main-
tained thereon enticing to the childish curiosity and in-
stincts, is not a culpable trespasser in any sound sense.
This is against the weight of authority, when measured
in mere numbers, which holds the child to the rule
applied to the adult who, when injured while trespass-
ing upon the premises of a defendant, can recover dam-
ages only when the injury was wanton or was due to
recklessly careless conduct on the defendant's part.
But, as said by a candid text-writer:

" 'This cruel and wicked doctrine, unworthy of a
civilized jurisprudence, puts *property* above *humanity,*
leaves entirely out of view the tender years and in-
firmity of understanding of the child, indeed his in-
ability to be a trespasser in sound legal theory, and
visits upon him the consequences of his trespass just

as though he were an adult, and exonerates the person or corporation upon whose property he is a trespasser from any measure of duty towards him which they would not owe under the same circumstances towards an adult.' 1 Thompson, Negligence (2d ed.), § 1026.

"The same writer after admitting the fact that, in many jurisdictions, the doctrine of trespass as a defense, even as applied to small children, must be regarded as established law, scathingly reprobating the doctrine as barbarous, says:

" 'Nevertheless, a few decisions of enlightened and humane courts are found, more or less tending to the conclusion that the owner of any machine or other thing which, from its nature, is *especially attractive to children,* who are likely to attempt to play with it in obedience to their childish instincts, and yet which is especially dangerous to them,—is under the duty of exercising reasonable care to the end of keeping it fastened, guarded, or protected so as to prevent them from injuring themselves while playing or coming in contact with it.' 1 Thompson, Negligence (2d ed.), § 1031.

"The more humane rule, as expressed in another text, has met with our unqualified approval:

" 'The owner of land where children are allowed or accustomed to play, particularly if it is unfenced, must use ordinary care to keep it in a safe condition, for they, being without judgment and likely to be drawn by childish curiosity into places of danger, are not to be classed with trespassers, idlers and mere licensees.' 3 Shearman & Redfield, Negligence (6th ed.), § 705."

The *Bjork* case is not determinative of the question now presented because that decision is finally rested on the doctrine of attractive nuisance. But it is authority for the proposition that the driver of the truck owed a duty greater than merely to refrain from inflicting willful or wanton injury. We think "the more humane rule," with respect to children who are, and can be, merely technical trespassers, is that of reasonable care. 45 C. J. 701, § 78. *Indianapolis, P. & C. R.*

*Co. v. Pitzer,* 109 Ind. 179, 6 N. E. 310, 10 N. E. 70, 58 Am. Rep. 387; *Meeks v. Southern Pac. R. Co.,* 56 Cal. 513, 38 Am. Rep. 67; *Albert v. Munch,* 141 La. 686, 75 So. 513, L. R. A. 1918A, 240; *Chesapeake & O. R. Co. v. Hawkins,* 174 Fed. 597, 26 L. R. A. (N. S.) 309; *Kentucky Central R. R. Co. v. Gastineau's Adm'r,* 83 Ky. 119; *Ziehm v. Vale,* 98 Ohio St. 306, 120 N. E. 702, 1 A. L. R. 1381; *Capano v. Melchionno,* 297 Mass. 1, 7 N. E. (2d) 593. In the *Gastineau* case, the court observed:

". . . but if they are of such tender years as to be devoid of discretion, then justice and the dictates of humanity require the exercise of reasonable care to prevent their being placed in danger, even though they may be, technically, trespassers; and this would be lacking if the employes of a company were to switch their trains, knowing that a child of such tender years as to have no discretion was in the immediate vicinity of them."

In the *Ziehm* case, an owner returned to his parked car and found a child four and a half years of age on the running board. He drove the child away twice, and contended that he owed the infant no further duty. The court held, however, that, while the child remained in close proximity to the car, the driver was not absolved from the continuous exercise of reasonable care.

Of our own cases, appellants cite *Macale v. Lynch,* 110 Wash. 444, 188 Pac. 517; *Garner v. Pacific Coast Coal Co.,* 3 Wn. (2d) 143, 100 P. (2d) 32; and *Schock v. Ringling Bros., etc.,* 5 Wn. (2d) 599, 105 P. (2d) 838, as applying the "willful and wanton" care doctrine to children trespassers. In the last two cases cited, the children ranged from ten to sixteen years of age. On that ground alone, the cases are distinguishable from the one at bar. In the *Macale* case, where the child was not quite six years old, the court said: "Without the testimony of respondent there is nothing in the

record which tends to show that the driver, Nolan, willfully and wantonly caused the injuries complained of; *or, if he owed that duty, in view of respondent's tender age, that he did not exercise ordinary care"* (italics ours)—thus explicitly recognizing the applicability of the rule of reasonable care with respect to very young children. Again, the court recognized the applicability of the rule of reasonable care in the case of *Young v. Hofferber,* 177 Wash. 234, 31 P. (2d) 95, where the child was ten years of age.

Relying, among others, on the last-cited case, appellants argue that, measuring Brown's actions by the rule of reasonable care, he was free from negligence. Let us, therefore, examine the evidence in the light of the generally accepted definition of reasonable care: that degree of care which a reasonably prudent man would exercise under the same circumstances, surroundings, and conditions.

Now, Brown knew that the children had been on the truck. He knew that they were very young. He knew that there were three of them. He knew that they were still in close proximity to the truck when he was ready to start. From his testimony, the jury might well have believed that he saw only two of the children before he put the truck in motion. They were in the street behind the truck. Where was the third? Should he, in the exercise of reasonable care, have ascertained where she was before he started? Let us see what appellants' own witnesses say about it. Cleve Newman, who delivered milk in the neighborhood, testified:

"Well, there is about four or five children over there that always come out when the milk truck comes, and they are generally out in the street anyway, and they see the trucks coming. I used to stop right next door to where this little girl got killed, and when you start

to slow down they would be generally back a little ways, and when I would stop they would want orange ade and ice and bottle caps. You know, like kids would. . . . Oh, I just take the milk and come back and pick them up and set them off the truck, and tell them to stand back a little, I always turn around there as it was as far as I went on Rogers street, and lots of times by the time you could take them off and get back in the truck they would be on the tail gate where you would have to be pretty careful. Q. What did you do then to get rid of them? A. Sometimes I would have to stop and take them off and sometimes I would start out, if I could see them all as I went away, but a number of times I have stopped and picked them off the tail gate. . . . Q. Now, you say if you could see all the children you would start up? A. Yes. Q. And if you couldn't see them all you would—A. I would start around and go back and kick them off."

James Kearney, another milk-truck driver, testified:

"Q. I believe you testified that you had lots of trouble with the children in that neighborhood is that right? A. Yes, I did. Q. And when the children were flocking around the car you would make them stand off to the side, so you could see them all, is that right? A. That's right. After I made my delivery. Q. And if you didn't see them all you wouldn't start out until you knew they were out there, is that right? A. That's right. Q. If there were three children standing out there near the truck when you delivered milk, then you start out and you see only two, you wouldn't start out, would you? A. I would ask the children where the other tot was. Q. You would take that precaution, wouldn't you? A. Yes, I do."

In the light of the testimony of these witnesses, who must be assumed to be reasonably careful drivers, we do not think there can be any doubt that the question of Brown's negligence was for the jury.

Judgment affirmed.

ALL CONCUR.