[No. 45492. En Banc. January 5, 1979.]

BILLY J. OCHAMPAUGH, *Individually and as Administrator, Appellant,* v. THE CITY OF SEATTLE, ET AL, *Respondents.*

*Rudolf V. Mueller* and *J. Robert Leach,* for appellant.

*John P. Harris, Corporation Counsel,* and *J. Roger Nowell, Assistant,* for respondents.

ROSELLINI, J.—In this wrongful death action, the appellant seeks damages of approximately $2,000,000 allegedly sustained as a result of the drowning of his two sons in a pond situated upon the respondents' Skagit River Transmission Line Corridor, which extends 85 miles from power generating dams near Newhalem to the Seattle suburbs. The tragedy occurred in the summer of 1973. On December 9, 1974, a claim was filed by the appellant with the respondent City of Seattle. The claim was denied, but the City, responding to a petition by persons residing near the pond, and after securing the necessary approval of governmental

agencies, filled the pond at a cost of about $23,000. On June 2, 1976, this action was instituted.

All of the available evidence pertaining to the accident and the nature of the pond and its environs was submitted to the court by affidavits and depositions, upon which the court, finding that there was no genuine issue of material fact and no basis for recovery, granted the respondents' motion for summary judgment.

These affidavits and depositions show that the pond, which was more or less oval in shape, was about 100 feet wide at its widest point and was shallow at the edges, reaching a depth of around 6 feet at its deepest point. Its origin was unknown, but it was thought that it had formed as the result of an excavation made before the City had acquired the corridor more than 50 years earlier. It was situated in an unimproved brushy terrain a few hundred yards from the housing development in which the appellant and his housekeeper and children resided and was accessible by way of the corridor's patrol road. Local residents who were familiar with it and the sheriff's deputies who found the bodies of the victims described it as an ordinary pond, having the same characteristics as other ponds located in the area, of which there were many. Its edges were boggy and there was an abrupt drop–off on one side. Its bottom was muddy and covered with debris, the water itself was muddy, and logs and other debris and one or two rafts floated on the surface. According to the undisputed evidence, however, these were not unusual features.

The pond was a favorite recreation spot for children living in the housing development, and one witness, who had been 12 years old at the time of the drownings, had been to the pond as many as 50 times, catching frogs and playing in the shallow water. His mother stated in her deposition that she did not consider the pond particularly hazardous and had no objection to her son's playing there, but that she did not permit her 4–year–old daughter to go that far away from home.

One resident, a deputy sheriff, stated that he did not consider the pond any more dangerous than a creek nearby or Lake Stevens, which was approximately the same distance away. No complaint had ever been made to the respondents about the pond, and its personnel in charge of property management were unaware of its existence, since it did not appear on any survey map which had been made since 1920, and they had not personally visited the area.

The Ochampaugh boys, who were 6 and 8 years of age, had been introduced to the pond by their father, the appellant, who took them there three times to fish. They did not know how to swim. The appellant had admonished them not to go to the pond by themselves. Returning home from work at around 6:30 p.m. on June 19, the appellant said, he found the boys missing and began to search for them. Their bodies were found late that evening in the pond. The death certificates fixed the time of death at about 8 p.m. There were no witnesses to the drownings. One body was found in 4 to 5 feet of water about 15 feet from the west bank, halfway across the pond. The other was found about 25 feet from the shore. One of the deputy sheriffs who found the bodies formed the opinion that the boys had floated out on something, like a raft, and had fallen off. The other was unwilling to venture an opinion as to how they had come to be so far from shore.

One of the members of the search and rescue team who found the bodies said he had never seen warning signs or fences surrounding any pond in Snohomish County. His was the only testimony upon this subject.

Error is assigned to the Superior Court's conclusion that the pond did not constitute an "attractive nuisance." It is conceded that the rule in this jurisdiction is that a natural body of water, or an artificial body of water having natural characteristics, is not in and of itself an attractive nuisance.[1]

---

[1]That the rule prevails in the great majority of courts, see Annot., *Liability of landowner for drowning of child*, 8 A.L.R.2d 1258 (1949). *See also*, Annot.,

The general rule is that a landowner owes no duty to a trespasser, except to refrain from causing willful or wanton injury to him. *Mail v. M.R. Smith Lumber & Shingle Co.,* 47 Wn.2d 447, 287 P.2d 877 (1955). However, as we said in that case, concern for the welfare and safety of children has led to the development of the attractive nuisance doctrine. The elements which must be present for that doctrine to apply in a given case are set out in the leading case of *Schock v. Ringling Bros. & Barnum & Bailey Combined Shows,* 5 Wn.2d 599, 105 P.2d 838 (1940), and since restated in *Mathis v. Swanson,* 68 Wn.2d 424, 413 P.2d 662 (1966), *Holland v. Niemi,* 55 Wn.2d 85, 345 P.2d 1106 (1959), and *McDermott v. Kaczmarek,* 2 Wn. App. 643, 469 P.2d 191 (1970):

(1) The instrumentality or condition must be dangerous in itself, that is, must be an agency which is likely to, or probably will, result in injury to those attracted by, and coming in contact with it; (2) it must be attractive and alluring, or enticing, to young children; (3) the children must have been incapable, by reason of their youth, of comprehending the danger involved; (4) the instrumentality or condition must have been left unguarded and exposed at a place where children of tender years are accustomed to resort, or where it is reasonably to be expected that they will resort, for play or amusement, or for the gratification of youthful curiosity; and (5) it must have been reasonably practicable and feasible either to prevent access to the instrumentality or condition, or else to render it innocuous, without obstructing any reasonable purpose or use for which it was intended.

The general rule as set forth in Restatement (Second) of Torts § 339 (1965) is broader in that it omits the requirement that the condition be attractive to children. It provides:

---

*Attractive nuisances,* 36 A.L.R. 224–35 (1925), and Restatement (Second) of Torts § 335, Caveat (1965).

§ 339 Artificial Conditions Highly Dangerous to Tres-
passing Children

A possessor of land is subject to liability for physical
harm to children trespassing thereon caused by an artifi-
cial condition upon the land if

(a) The place where the condition exists is one upon
which the possessor knows or has reason to know that the
children are likely to trespass, and

(b) the condition is one of which the possessor knows
or has reason to know and which he realizes or should
realize will involve an unreasonable risk of death or seri-
ous bodily harm to such children, and

(c) the children because of their youth do not discover
the condition or realize the risk involved in intermed-
dling with it or in coming within the area made danger-
ous by it, and

(d) the utility to the possessor of maintaining the con-
dition and the burden of eliminating the danger are
slight as compared with the risk to children involved, and

(e) the possessor fails to exercise reasonable care to
eliminate the danger or otherwise to protect the
children.[2]

While couched in different language, the general import
of section 339 is the same as that of our rule, except that
the element of attractiveness is omitted, and the rule is
expressly limited to artificial conditions. The Restatement
recognizes that the courts in some of the early cases
insisted that the child must have been attracted to the
premises by the instrumentality or condition which injured
him; later cases have rejected this notion. Comment *b* at
page 198 says:

It is now recognized by most of the courts that the basis
of the rule is merely the ordinary negligence basis of a
duty of reasonable care not to inflict foreseeable harm on
another, and that the fact that the child is a trespasser is
merely one of the facts to be taken into consideration.
The result is a limited obligation to the child, falling

[2]Section 339 as it was worded prior to the 1965 edition, is reviewed by Dean
William L. Prosser (the reporter for the later edition) in an article, *Trespassing
Children,* 47 Cal. L. Rev. 427 (1959), which apparently inspired the subsequent
revision.

short of a duty to prevent all foreseeable harm to him, but requiring reasonable care as to those conditions against which he may be expected to be unable to protect himself.

■ Both our rule and the Restatement declare that the risk must be great enough that harm to children is likely to or probably will result if children are exposed to the condition; that children, incapable of discovering or appreciating the danger, are likely to trespass there, and that it must be reasonably practical to protect children from the danger. The Restatement stresses the significance of the possessor's knowledge (or reason to know) of the dangerous condition and the likelihood of trespassing children. This element, though not articulated, is essential and is implicit in our statement of the elements of the doctrine.

In a caveat at page 197, and comments *j* and *p,* the Restatement declares the prevailing rule to be that a natural condition such as a body of water does not constitute the kind of hazard which this doctrine embraces, in the absence of some factor creating a special risk that the child will not realize the danger and avoid it. One reason for the rule which the Restatement gives is that the hazards of such natural phenomena may reasonably be expected to be understood and appreciated by any child of an age to be allowed at large. Another reason frequently cited, and noted in the Restatement, is that in most cases the burden of improving land in a state of nature in order to make it safe for children would be disproportionately heavy.

This court, like the courts in general, has refused to extend the doctrine of "attractive nuisance" to cases where children have drowned in a pond or other body of water having natural characteristics and no hidden dangers not ordinarily found in such bodies of water. *Barnhart v. Chicago, M. & St. P. Ry.,* 89 Wash. 304, 154 P. 441 (1916); *Smith v. McGoldrick Lumber Co.,* 124 Wash. 363, 214 P. 819 (1923); *Meyer v. General Elec. Co.,* 46 Wn.2d 251, 280 P.2d 257 (1955). We have denied recovery where the pond

was one created as a result of grading done by the defendant and the victim was drowned when he fell from a raft which had been constructed by boys of the neighborhood. *Barnhart v. Chicago, M. & St. P. Ry., supra.* We have done so where a child 2 1/2 years of age drowned in a commercially operated ditch, which was unfenced. *Meyer v. General Elec. Co., supra.* We observed in that case that there was nothing deceptive about the ditch, and it contained no inextricable trap and was not unnaturally dangerous. In *Smith v. McGoldrick Lumber Co., supra,* we refused to impose liability even though the use of a natural body of water as a mill pond created an extraordinary hazard of entrapment beneath a carpet of logs, where the owner did all that was feasible to discourage children from playing on the logs, having fenced the area where practicable and placed warning signs at various places about the pond.

*Barnhart v. Chicago, M. & St. P. Ry., supra,* is very similar to the case before us. The deceased, an 8–year–old boy, was playing with his 6–year–old brother on a raft constructed by other boys, when he fell off the raft and was drowned. In deciding that the owner of the artificially formed body of water in that case was not required to fence or drain it, the court, speaking by Main, J., said:

> The question here presented is not whether the owner of property may be liable, (a) by reason of a trap or pitfall upon his property which may produce the death or injury; (b) a hidden or concealed danger; or (c) a dangerous agency in close proximity or so near a highway that in the use of the highway an accident may occur; but is whether a pond of water is a dangerous agency such as will subject the owner of the property to liability for damages for the death of a child of tender years attracted to the pond for the purpose of play. The turntable doctrine makes the owner liable because the dangerous agency was attractive to children of tender years, and in playing about or with such agency, accident or injury would probably result.
>
> That a pond of water is attractive to boys for the purposes of play, swimming, and fishing, no one will deny. But its being an attractive agency is not sufficient to

subject the owner to liability. It must be an agency such as is likely to, or will probably result in, injury to those attracted to it. That many boys every year lose their lives by drowning is a matter of common knowledge. But the number of deaths in comparison to the total number of boys that visit ponds, lakes, or streams for purposes of play, swimming, and fishing, is comparatively small. It would be extending the doctrine too far to hold that a pond of water is an attractive nuisance, and therefore comes within the turntable cases.

*Barnhart,* at 306–07.

We also quoted with approval this statement from the leading case of *Peters v. Bowman,* 115 Cal. 345, 47 P. 113 (1896):

A body of water—either standing as in ponds and lakes, or running as in rivers and creeks, or ebbing and flowing, as on the shores of seas and bays—is a natural object incident to all countries which are not deserts. Such a body of water may be found in or close to nearly every city or town in the land; the danger of drowning in it is an apparent open danger, the knowledge of which is common to all; and there is no just view consistent with recognized rights of property owners, which would compel one owning land upon which such water, or part of it, stands or flows, to fill it up, or surround it with an impenetrable wall."

*Barnhart,* at 308.

It was further observed that to hold the possessor of land liable under such circumstances would be to impose upon him an oppressive burden and shift the responsibility for the care of children from their parents to strangers.

 The most significant factor, we believe, to be considered when it must be decided whether liability will be imposed upon the possessor for a condition existing upon the land, is the likelihood or probability of harm to others which it involves. As the undisputed testimony given by depositions and affidavits in this case demonstrates, the incidence of drownings in ponds such as that involved continues to be slight (as it was when *Barnhart v. Chicago, M. & St. P. Ry., supra,* was decided) when compared with the

extent of use that is made of such bodies of water for recreational purposes. The numerous ponds, lakes, rivers, creeks, and miles of shoreline in this state comprise one of its most cherished amenities, and to require that they be drained, filled, or surrounded by impregnable fences (which appear to be the only means of making them child proof) in order to escape liability for the occasional drowning which occurs, would not only impose an unreasonable burden on the owner but would also run counter to the public policy of this state.

We note that the legislature has provided that landowners who open their property to others for recreational use without charging a fee, shall not be liable for unintentional injuries to such persons, except where a known dangerous latent condition causes injuries and warning signs have not been conspicuously posted. RCW 4.24.200–.210. A proviso to the statute disclaims any intent to alter the law of attractive nuisance, and we may presume that it was enacted with our cases in mind.

It is apparent that this statute was enacted because of a greatly expanding need and demand for outdoor recreational opportunities. *See* J. Barrett, *Good Sports and Bad Lands: The Application of Washington's Recreational Use Statute Limiting Landowner Liability,* 53 Wash. L. Rev. 1 (1977).

The cost to the respondents of filling the pond in this case demonstrates the heavy burden which the duty of removing such natural hazards would place on the landowner. And at the same time the neighborhood has lost a recreational amenity which apparently was enjoyed by both adults and children. The danger of drowning has not been removed, as there is a creek and a very large lake within a comparable distance.

Another consideration is the damage to wildlife and the environment generally which a rule encouraging the destruction of ponds and lakes might portend.

The appellant does not suggest that we abandon our rule with respect to natural bodies of water or artificial bodies

having natural characteristics. Rather, he urges that the pond in which these drownings occurred was extraordinarily dangerous, this in spite of the fact that it was frequented by children and there had never been an accident before. Because the water was murky, or muddy, he argues, the hazards of its soggy bottom, slippery debris, and its changing contours, while they were not extraordinary in such ponds, constituted concealed dangers and rendered the pond a trap.

The appellant cites the case of *Bartlett v. Heersche*, 204 Kan. 392, 462 P.2d 763 (1969), wherein the Kansas court held that a jury might properly find liability upon the showing made that two small boys were attracted to and drowned when they fell from a raft used in sandpumping operations in a body of water constituting part of a commercially operated sandpit. The pit was unfenced, in violation of a local ordinance. The court there found inapplicable cases which hold that the doctrine of attractive nuisance does not impose liability upon the possessor of a body of water which exists in a state of nature, and refused to agree with the defendant's contention that the danger of drowning was one which was open and apparent. It appears that the body of water there dropped from a few inches to 10 feet in depth within a space of a few feet, but at the shoreline had a deceptive appearance of consistent shallowness. At any rate, the court concluded that a jury might find that the children were incapable of appreciating the danger. The court also emphasized the violation of the ordinance as constituting negligence.

Because of these factual differences, we do not find that case persuasive here. The features of the respondents' pond which the appellant characterizes as deceptive were in fact common features, the character of which is generally known and understood by children old enough to be allowed to play at such places. Consequently, the danger of drowning in the pond was no greater than that which existed in any other pond of similar size and depth. Contrary to the

appellant's contention, there was no evidence which would support a finding that the pond constituted a trap.

It is suggested that a jury could find that the raft (or rafts) constituted an added attraction, which probably lured the children into the water. There is nothing in the evidence to indicate that the respondents knew or had any reason to know of the presence of a raft upon the pond. No complaint or report having been made to them by the appellant or anyone else, and having no duty to inspect the premises (*see* Restatement (Second) of Torts § 339, comments *g* and *h* (1965)), it cannot be inferred that they knew of the existence of rafts on the pond. In the absence of such knowledge, it cannot be said that they were negligent in failing to remove them.

Furthermore, while some courts have regarded such a raft as "bait," the general rule is that the fact that a drowning occurs as a result of falling from a raft does not render the possessor liable, if the body of water is not itself an attractive nuisance. *See* Annot., *Liability of landowner for drowning child,* 8 A.L.R.2d 1298–99 (1949). As the Supreme Court of Idaho pointed out in *Bass v. Quinn–Robbins Co.,* 70 Idaho 308, 216 P.2d 944 (1950), the fact that a raft or other object floats on a pond does not change the rule of nonliability, except where the floating object may conceal an otherwise apparent risk. Supporting this statement, numerous cases are cited in that case, as well as in *Lockridge v. Standard Oil Co.,* 124 Ind. App. 257, 114 N.E.2d 807 (1953) (where *Barnhart v. Chicago, M. & St. P. Ry., supra,* is cited) and *Harriman v. Afton,* 225 Iowa 659, 281 N.W. 183 (1938).

The court in the latter case said that if a child is attracted to a body of water for the purpose of fishing and, while doing so, loses his balance and drowns, or if he enters it to swim and drowns, there is no liability and there is no principle of law which would justify a different rule if he falls off a floating object. As the courts have often said, it is the pond of water which constitutes the danger, and the means by which the child chooses to enter it is immaterial,

assuming the accident is not caused by a defect in the instrumentality itself, or by a hazard which it conceals.

It is not suggested that there was any defect in the raft (or rafts) or any hazard, not otherwise apparent, which it hid. The victims of this sad accident were not only presumed to be aware of the danger of drowning in the pond, but were expressly admonished about the danger by their father. The accident evidently occurred because they could not resist the allure of the pond, in spite of their knowledge of its danger, and not because it held any extraordinary hazard. As the cases we have cited make clear, the fact that occasionally a child will deliberately risk drowning does not operate to change the rule which protects from liability the owner of a common natural hazard such as a pond of water.

Natural bodies of water, or artificially formed bodies of water which have the characteristics of natural bodies, do not constitute dangers which come within the doctrine of "attractive nuisance" for a number of reasons. While they are undoubtedly alluring to children, their dangers are open and apparent, and easily avoidable, and it is reasonable to expect that children too young to appreciate the danger will be protected from them by their parents or other custodians. While they involve a possibility of injury or death, they do not present a likelihood or probability of such harm. And it is generally not reasonably practical or feasible either to prevent access to such bodies of water or to render them innocuous without obstructing the uses and functions which they serve. All of those factors are present in this case, and attest to the correctness of the Superior Court's judgment upon this issue.

The appellant proposes that this court should repudiate the notion that children can be trespassers and should impose upon the possessor of land the duty of exercising reasonable care toward children, whose presence upon his land can reasonably be anticipated or of which he is aware. The answer to this proposal is that the court has already done so. With respect to artificial conditions upon the land, the liability of the possessor, as defined by this court and in

the Restatement (Second) of Torts § 339 (1965), is based upon a theory of negligence. With respect to natural conditions, including artificial conditions which simulate nature, the danger of which is open and apparent to everyone, this court, along with the majority of other courts (and in accord with the Restatement's caveat at page 207), has consistently held that the owner cannot reasonably be required to take affirmative steps to make the condition safe or to warn of its presence or to prevent access to it. In other words, in such cases, we have held that as a matter of law the probability of injury is not great enough to warrant a conclusion that the duty of exercising reasonable care demands such affirmative acts.

Where activities are carried on by the possessor of land, we have imposed a duty of exercising reasonable care not to injure a child of whose presence the possessor or his agents is aware, regardless of the child's status, and even though no "attractive nuisance" is involved. *Sherman v. Seattle,* 57 Wn.2d 233, 356 P.2d 316 (1960); *Helland v. Arland,* 14 Wn.2d 32, 126 P.2d 594 (1942). The statement found on pages 645–46 of *McDermott v. Kaczmarek,* 2 Wn. App. 643, 469 P.2d 191 (1970), to the effect that the only duty to a child trespassing is to refrain from willfully and wantonly injuring him, was evidently made without awareness of these cases.

Thus where there is negligence which causes injuries to a child, the law of this state affords a remedy. The difficulty with the appellant's case is that the allegations disclose no basis for a finding of negligence on the part of the respondents.

 It is contended that the court erred in its interpretation of RCW 78.12.010, which requires any persons who dig, sink, or excavate any "shaft, excavation or hole" to fence the same "to securely guard against danger to persons and animals from falling into such shafts or excavations." This statute was enacted in 1890, and was entitled "An Act to secure persons and animals from danger arising from mining." Laws of 1889–90, p. 121. It was construed by this

court in 1920, in a case in which young boys were playing football near the entrance to a mine slope. In searching for their ball, which had rolled onto the slope, they entered an unlocked door in the screen which protected the entrance. One of the boys, leading the others, disappeared from their sight. His body was found 336 feet from the entrance, where he had been overcome by "black damp." A damage action was begun in reliance on the statute. Speaking of the evil which inspired its enactment, this court said:

> Unguarded excavations on private property were a source of danger, and unless some warning of their existence or safeguards were afforded they were constant menaces to the lives and limbs of persons using the property and unaware of their existence. This is especially true in mining districts, and on this account the statute was passed in this state, and similar statutes have been passed in other states where mining operations are carried on. In view of the language of this statute and the dangerous results which were sought to be prevented, it cannot be said that the statute means, when it says that the guards are for the purpose of preventing the "falling" of persons into excavations, that thereby tunnels and slopes should have been so guarded that no one could walk into them. It might have been that the legislature could have made it obligatory upon mining companies to guard against accidents from other sources as well as "falling." The deceased having voluntarily walked into the passageway, cannot be said to have "fallen" into it; nor was the passageway of such character as to make it possible for him to "fall" into it. The purpose of the law was to prevent an involuntary entrance into a "shaft, excavation or hole."

*Dernac v. Pacific Coast Coal Co.*, 110 Wash. 138, 140–41, 188 P. 15 (1920).

In denying recovery, the court stressed the fact that the boy entered the slope through his own voluntary act.

That is the only case in which this court has had the statute before it for consideration. In *McDermott v. Kaczmarek, supra,* the Court of Appeals, Division One, however, was asked to approve it as a vehicle for recovery where a boy had fallen from a cliff which was created by a rock

quarrying operation. The Court of Appeals, construing the statute strictly as this court had done in *Dernac,* held that it was meant to apply only to excavations of the pit type, the area of which on the surface is relatively small and which can be fenced without great expense.

Both of these holdings appear to be correct interpretations of the legislative intent. The concern expressed by the legislature was that unfenced excavations of shafts or holes constituted a trap for the unwary. It was not addressing its attention to the open and apparent dangers of holes which are filled with water, such as the pond in this case.

Further, as the respondents suggest, once an "excavation" is filled with water, it no longer has that character but takes on instead the character of a pool or pond. An excavation is a cavity; a cavity is a hollow, and a hollow is an unfilled space. *Webster's Third New International Dictionary* (1968).

Had the legislature intended this act to apply to bodies of water which have their origin in excavations, it should have and, we are confident, would have so stated and would have added drowning as a danger which the act was designed to prevent. The court below did not err in holding this statute inapplicable.

The judgment is affirmed.

WRIGHT, C.J., and HAMILTON, STAFFORD, BRACHTENBACH, and HOROWITZ, JJ., concur.

DOLLIVER, J. (dissenting)—The traditional approach to the problem presented in this case is to classify the plaintiff according to his status, that is, based upon how he entered the premises. If the plaintiff entered without permission, he is a trespasser, and the landowner's duty is merely to refrain from wanton and willful injury to him. *Mail v. M.R. Smith Lumber & Shingle Co.,* 47 Wn.2d 447, 287 P.2d 877 (1955). In order to circumvent this harsh rule where children are involved, the courts have developed the attractive nuisance doctrine. W. Prosser, *Handbook of the Law of*

*Torts* 364 (4th ed. 1971); *Barnhart v. Chicago, M. & St. P. Ry.,* 89 Wash. 304, 154 P. 441 (1916); *Bjork v. Tacoma,* 76 Wash. 225, 135 P. 1005 (1913). The application of the attractive nuisance doctrine is a question of law: the trial court determines whether the instrumentality or condition which caused the injury meets five specific tests. *Shock v. Ringling Bros. & Barnum & Bailey Combined Shows,* 5 Wn.2d 599, 105 P.2d 838 (1940). If any one of the tests is not met, the attractive nuisance doctrine is not available to the plaintiff, and his case will not reach the jury unless there is some evidence of wanton and willful conduct by the defendant landowner. *Mail v. M.R. Smith Lumber & Shingle Co., supra.* In this case, the trial court found that the pond in which Joseph and Michael Ochampaugh drowned did not meet the attractive nuisance tests and granted summary judgment for the defendants.

A growing number of states have rejected this approach and have abolished the traditional common–law classifications, distinctions and exceptions for trespassers, licensees and invitees. *Rowland v. Christian,* 69 Cal. 2d 108, 443 P.2d 561, 70 Cal. Rptr. 97 (1968); *Pickard v. Honolulu,* 51 Hawaii 134, 452 P.2d 445 (1969); *Mile High Fence Co. v. Radovich,* 175 Colo. 537, 489 P.2d 308 (1971); *Smith v. Arbaugh's Restaurant, Inc.,* 469 F.2d 97 (D.C. Cir. 1972); *Mariorenzi v. Joseph Diponte, Inc.,* 114 R.I. 294, 333 A.2d 127 (1975); *Ouellette v. Blanchard,* 116 N.H. 552, 364 A.2d 631 (1976); *Scurti v. New York,* 40 N.Y.2d 433, 354 N.E.2d 794, 387 N.Y.S.2d 55 (1976); *see* Annot., *Modern Status of Rules Conditioning Landowner's Liability Upon Status of Injured Party as Invitee, Licensee, or Trespasser,* 32 A.L.R.3d 508 (1970). These courts have simplified matters by abandoning classification of the plaintiff and adopting the foreseeability test used in all other tort actions to questions of premises liability. They have defined the duty owed by landowners as one of reasonable care under all the circumstances. These courts have held that the method by which the plaintiff entered the property and the extent to which the defendant had reason to know of his presence are

merely two of the factors which the jury must consider in deciding whether the landowner violated the standard of conduct imposed upon him.

The notion of abandoning the common–law classifications is not new to this court. In *Sherman v. Seattle,* 57 Wn.2d 233, 356 P.2d 316 (1960), we affirmed a jury verdict for the plaintiff, a child of three, despite our conclusion that the attractive nuisance doctrine was not applicable. We held that, regardless of the plaintiff's status, the defendant owed him the duty to use reasonable care and was negligent in failing to protect the child from the hazard where the child's presence was reasonably foreseeable.

> [W]e think that regardless of [plaintiff's] status—be it that of an invitee, licensee, or trespasser—[defendant] owed him the duty to use reasonable care.

*Sherman v. Seattle, supra* at 239. *See also Helland v. Arland,* 14 Wn.2d 32, 126 P.2d 594 (1942); *Potts v. Amis,* 62 Wn.2d 777, 384 P.2d 825 (1963); *Memel v. Reimer,* 85 Wn.2d 685, 538 P.2d 517 (1975).

I agree with the courts of California, Hawaii, Colorado, Rhode Island, New Hampshire, New York and other jurisdictions which have allowed a plaintiff to state a cause of action under circumstances similar to those which exist here. The duty of the city should be one of reasonable care; the jury should be allowed to determine whether that duty was violated. I would reverse the summary judgment order and allow this case to proceed to trial.

UTTER and HICKS, JJ., concur with DOLLIVER, J.

Reconsideration denied February 14, 1979.