Mary MARTURELLO, individually and as Guardian of Rebecca Marturello, and as Personal Representative of the Estate of Rachel Marturello; Daniel Wershow, as Personal Representative of the Estate of Zandra Lafley; Leeann Lafley, individually; Estate of Rachel ·Marturello; Estate of Zandra Lafley, Plaintiffs—Appellants,

v.

NATIONAL RAILROAD PASSENGER CORPORATION, a District of Columbia Corporation dba Amtrak; John Doe, 1–5, employees of Amtrak; Jane Doe, 1–5, employees of Amtrak, Defendants—Appellees.

No. 03–35718.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 9, 2005.

Decided April 6, 2005.

Eugene N. Bolin, Jr., Esq., Law Offices of Eugene N. Bolin, Jr., Seattle, WA, for Plaintiffs–Appellants.

Timothy David Wackerbarth, Esq., Michael B. King, Esq., Lane Powell, P.C., Seattle, WA, for Defendants–Appellees.

Before: GOODWIN, FERNANDEZ, and GOULD, Circuit Judges.

MEMORANDUM *

We must decide whether an Amtrak engineer's conduct could be found by a jury to have willfully or wantonly caused the death of two young girls. The families of Rachel Marturello and Zandra Lafley appeal the district court's order granting

---

* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36–3.

Amtrak summary judgment on appellants' wrongful death claims. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse and remand.

## I

This case concerns the tragic death of two young girls who, while trespassing on a railroad trestle, were struck by a northbound Amtrak train on the afternoon of April 20, 2000, and died upon impact. The two girls, Rachel Marturello and Zandra Lafley, ages eleven and thirteen, were killed while they were walking on the Green River railroad trestle in Kent, Washington, near a bike trail and swimming hole frequented by adolescents. Rachel Marturello, Zandra Lafley, and Rachel's older sister, Rebecca Marturello, had started across the river going north to south on the east side of the trestle. The two younger girls lagged behind Rebecca Marturello. When Rebecca first heard the train's whistle and turned to see the train, she was only five feet from the trestle's south end. But Rachel and Zandra were not yet halfway across the trestle, poised near its midpoint over the river. Rebecca shouted to the younger girls to run back. After Rebecca saw the other girls turn around to go back to the side closest to them, Rebecca safely exited the trestle on the south end closest to her. Rebecca testified that the duration of time from when she first heard and saw the train to the time when it crossed the trestle was about ten to fifteen seconds. She heard the train's whistle again in a series of blasts as it approached and crossed the trestle but she did not see the fatal impact

that propelled the younger girls more than a hundred feet from the trestle.

The trestle supports parallel northbound and southbound railroad tracks that cross the Green River. Engineer Gary Reithmeier testified that he first saw people on the northbound track when his locomotive was about a half mile from the trestle. About five minutes before then, Reithmeier had received a radio dispatch that kids were "playing chicken" in the area of the Green River trestle he was rapidly approaching. When he first saw the girls, Reithmeier blew the train's horn and "lightly" applied the train's service brakes, slowing the train by 14 mph from 79 mph to 65 mph.[1] In his deposition, Reithmeier testified that when he saw the girls move from the east track—the track upon which the train was traveling toward them—to the west track, he released his brakes. It is not disputed that when the engineer released the brakes, the girls were still on the trestle. Reithmeier further testified that just before the train reached the trestle, he saw two of the girls try to cross back to the east side, and he blew his whistle again while maintaining speed. He testified that he thought the girls were "in the clear" on the east side of the tracks until he heard the "thump" of the train hitting them.

The families and estates of the deceased girls filed a wrongful death suit against Amtrak in the Superior Court of the State of Washington for King County; Amtrak then removed the case to the United States District Court for the Western District of Washington.[2] The

---

1. The engineer testified in his deposition that he was traveling about 75 mph and dropped his speed to about 60 mph. The locomotive's event recorder showed that the train was traveling 79 mph when Reithmeier began braking and reduced speed to approximately 65 mph at the time of impact.

2. Appellants initially named Amtrak, the City of Kent, and the Burlington Northern & Santa Fe Railway Company (BNSF) as defendants. After Amtrak removed the case to federal court, the district court granted the City of Kent's motion for summary judgment, a decision not appealed. The plaintiffs also

federal district court granted Amtrak's summary judgment motion, concluding that 1) the standard of care owed by Amtrak to the plaintiffs was to refrain from willfully or wantonly injuring them; and 2) there was insufficient evidence from which a jury could find for the plaintiffs on their claims of willful or wanton misconduct on the part of Amtrak. This timely appeal followed.[3]

## II

Because the girls were trespassing on the Green River trestle, the standard of care owed by Amtrak to the plaintiffs was to refrain from willfully or wantonly injuring them. *Ochampaugh v. City of Seattle*, 91 Wash.2d 514, 588 P.2d 1351, 1353 (1979).[4] There is no evidence that Amtrak acted "willfully" with the intention to harm the girls; the sole issue in the case is whether the railroad's conduct, through the acts or omissions of its engineer or otherwise, could be found by a reasonable jury to be "wanton," in the sense required by Washington law. The leading case under Washington law is *Adkisson v. City of Seattle*, 42 Wash.2d 676, 258 P.2d 461 (1953). The often-quoted Washington law definition of wanton misconduct from *Adkisson* is:

> Wanton misconduct is not negligence, since it involves intent rather than inad-

vertence, and it is positive rather than negative. It is the intentional doing of an act, or intentional failure to do an act, in reckless disregard of the consequences, and under such surrounding circumstances and conditions that a reasonable man would know, or have reason to know, that such conduct would, in a high degree of probability, result in substantial harm to another.

*Id.* at 467. Later Washington cases have reaffirmed the standard established in *Adkisson*. *See, e.g., Sikking v. Nat'l R.R. Passenger Corp.*, 52 Wash.App. 246, 247, 758 P.2d 1003 (1988); *Kremer v. Audette*, 35 Wash.App. 643, 645–47, 668 P.2d 1315 (1983). *Adkisson* also pointed out the difference between "willful" and "wanton" misconduct: "[W]ilful misconduct is characterized by intent to injure, while wantonness implies indifference as to whether an act will injure another." 258 P.2d at 466 (quoting 38 Am.Jur. *Negligence* § 48 (1941)).

### A

With this standard in mind, we examine whether the appellants produced evidence from which a reasonable jury could conclude that Engineer Reithmeier's decision to release the train's service brakes and continue over the Green River trestle at approximately 65 mph, while the girls were still on the trestle, was wanton con-

stipulated to the dismissal of all its claims against BNSF. The case proceeded with plaintiffs' claims against Amtrak, until the ruling that generated this appeal.

3. We review the district court's grant of summary judgment de novo. *Ground Zero Ctr. for Non–Violent Action v. U.S. Dept. of Navy*, 383 F.3d 1082, 1086 (9th Cir.2004). Viewing the facts in the light most favorable to the nonmoving party, we must determine whether a genuine issue of material fact exists, and whether the district court applied the law correctly. *Fortyune v. Am. Multi–Cinema, Inc.*, 364 F.3d 1075, 1080 (9th Cir.2004).

"[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

4. Exceptions to this standard of care, like the attractive nuisance doctrine, are not argued by appellants on appeal, and in any event are inapplicable. Thus simple negligence of Amtrak, even if shown, is not sufficient for the case to proceed.

duct, showing a reckless disregard for the girls' safety. We conclude that there are genuine issues of material fact regarding evidence from which a jury could so conclude, and that the appellants' evidence, if fully credited, and if all reasonable inferences are granted thereon, is sufficient for a jury to find Amtrak liable.

First, there are genuine issues of material fact about the deceased girls' movements on the trestle as the train approached. The City of Kent Police Department's report, taken on the day of the accident, reads in relevant part:

> Reithmeier said that he had been northbound on the easterly track and had seen the three pedestrians on the south side of the trestle. *Reithmeier said that the pedestrians appeared to be playing on the trestle and were moving back and forth between the east and west tracks.* Reithmeier said that he had sounded the horn at the S. 277 St. crossing and that as soon as he saw the pedestrians, he applied the brakes and sounded the horn again. The pedestrians moved from the east track to the west track and Reithmeier said he released the brakes. Reithmeier said that the track speed at that location was 75 M.P.H. and that he had slowed to about 65 M.P.H. Reithmeier said that the pedestrians ran across the trestle and that one moved to the west track but that two of them squatted down just to the east of the east track as soon as they cleared the trestle. Reithmeier said that he applied

the brakes but still struck the pedestrians.

(emphasis added). According to this Kent police report, as stressed above, Reithmeier said that the people on the tracks "appeared to be playing on the trestle, and were moving back and forth between the east and west tracks" on the south side of the trestle.[5] The appellants also submitted deposition testimony of another member of the train's crew, Erik Lawrence, that Reithmeier after the accident had told Lawrence that he thought the girls were "playing chicken" ahead.[6]

Reithmeier's later deposition testimony differed materially from his earlier account recorded in the Kent police report and from what he told Lawrence. Reithmeier omitted his initial description of the girls' movements included in the police report and flatly denied telling any crew members, including Lawrence, that he thought the girls were "playing chicken." Instead, in his deposition, Reithmeier testified that the girls moved between the tracks only twice: once to the west track to get out of the way (after which he released the brakes), and then once back into the east track, before impact.

Reithmeier's police report account is also unclear as to *when* the girls crossed back to the east track: the report jumps from the girls moving to the unoccupied west track to "the girls squatting down on the east track" right before impact. Did the girls cross back in front of the train a split second before the train reached the

---

**5.** This description is consistent with the meaning of "playing chicken" in a railroad context.

**6.** Erik Lawrence in deposition testified:
  Q: Did you have any discussions later with Kenny or the conductor or the engineer about the incident?
  A: Uh-huh. Yes.
  Q: What were those discussions?
  A: I talked to the engineer [Reithmeier] about what he thought—what he thought happened, and he said it looked like they were playing chicken.
  . . . .
  Q: Did [Reithmeier] use the word or phrase, playing chicken, I think they were playing chicken?
  A: Yes.

trestle, as Reithmeier later testified in his deposition, or did they cut back across the trestle to the east track at some point earlier, consistent with their earlier movements? Did Reithmeier have reason to think that the girls might be "playing chicken" with the train? The statements attributed to Reithmeier on the day of the accident are evidence from which a jury might have concluded that Reithmeier then thought the children were "playing chicken" with the train and thus was aware of more risk than his deposition testimony portrayed. *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir.1992) ("Credibility determinations are for the trier of fact, and therefore, are not appropriately resolved by summary judgment."). Because conflicting versions of the events were revealed in the disparate evidence given by Reithmeier in his deposition, as contrasted with what he told the police and Lawrence on the day of the accident, it is a jury's province to determine whether Reithmeier had reason to think the children were playing chicken on the trestle tracks as the train proceeded at about 65 mph, hurtling towards and across the trestle.

The factual discrepancies between the Kent police report and Reithmeier's later deposition testimony present genuine issues of material fact properly decided by a jury. If the girls were playing chicken, or if the girls crossed back to the east track in front of the train at an earlier point, or if the girls were in a panic or confused, crossing back and forth without a reasoned purpose as the train approached, a reasonable jury could find the engineer's decision to cease braking and drive over the trestle at 65 mph to be wanton misconduct. Even if Reithmeier only initially saw the girls crisscrossing the tracks as the train approached, as he first told the Kent police and Lawrence, a reasonable jury could conclude that Reithmeier still would have had reason to believe the girls might not remain on the west tracks and might cross the tracks again in imminent danger.[7] This in turn would permit a reasonable jury to decide that Reithmeier's decision to release the brakes, and to proceed across the trestle at 65 mph without further braking, was wanton misconduct. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505 (holding that an issue of material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

There is a further piece of evidence that the girls might not stay put on the west side of the trestle. Five minutes before the accident, Reithmeier received a radio dispatch that kids were "playing chicken" with a train in the area of the Green River trestle. An examination of whether conduct could be considered wanton must be undertaken in the context of the defendant's "knowledge of such surrounding circumstances and existing conditions." *Adkisson*, 258 P.2d at 466. Thus, when Reithmeier saw the girls on the trestle five minutes later, a jury would have had leeway to conclude that Reithmeier had reason to think the girls were prone to crossing the tracks unpredictably, as he was forewarned in the radio dispatch. In light of these circumstances, Reithmeier's releasing of the brakes and continuing across

---

**7.** We note that the appellants did not argue that the girls were intentionally "playing chicken" with the train on the tracks. We need not consider whether the girls were in fact "playing chicken." Rather, the evidence in the record creates a genuine issue of material fact whether Reithmeier *believed or had* *reason to believe* the girls were "playing chicken," or were engaged in some similar unpredictable movements on the railroad tracks, intentional or accidental. That determination is material to assessing whether Reithmeier's conduct under the circumstances was wanton.

the trestle at 65 mph under the assumption that the girls would stay on the west track could be found by a reasonable jury to be wanton conduct in reckless disregard for the girls' safety.

## B

Under Washington law, prior knowledge of a danger or a dangerous situation may be evidence of wanton misconduct. *Evans v. Miller*, 8 Wash.App. 364, 507 P.2d 887, 889–90 (1973).[8] Reithmeier knew from prior experience that the term "playing chicken"—used in the radio dispatch he received five minutes before the accident—meant that a child's movements were unpredictable, and the child might cross back in front of the train. There was evidence that in 1997, a train Reithmeier was driving struck and killed a twelve year old boy who was "playing chicken" with the train when the boy jumped out in front of the train and tried to jump away at the last minute. Reithmeier also knew from prior experience that trestles could be dangerous places specifically associated with children: there was evidence that in 1987, Reithmeier's train struck and killed a fifteen year old girl on the Nisqually River trestle, which is approximately thirty miles from the Green River trestle.

Accordingly, Reithmeier's prior deadly accidents, coupled with the "playing chicken" radio dispatch he received shortly before the train's fateful encounter with the children on the Green River trestle, would have permitted a reasonable jury's conclusion that Reithmeier knew: 1) people he saw on the Green River trestle might be children "playing chicken;" 2) children "playing chicken" were prone to unpredictable behavior; and 3) trestles, with children on them, present situations of grave danger. Reithmeier's prior accident experience, a relevant consideration in determining wanton conduct under Washington law, also supports submitting to the jury the question whether Reithmeier's actions were in wanton disregard of the safety of the children confronted on the trestle.

## C

In addition to the factual discrepancies in Reithmeier's account of the accident and his prior accident history, there is a genuine issue of material fact whether Reithmeier, having seen the children on the track in front of him, should have continued braking until the girls were safely off the trestle. A jury could reasonably conclude that the decision to cease braking and drive over the trestle at 65 mph with the girls still on the trestle, even if on the opposite set of tracks, was wanton misconduct. *Cf.* 57A Am.Jur.2d *Negligence* § 263 (1962) ("If the actor realizes or at least has knowledge of sufficient facts to cause a reasonable person to realize the existing peril for a sufficient period of time beforehand to give him or her a reasonable opportunity to take means to avoid the accident, then he or she is guilty of wanton misconduct if he or she recklessly disregards the existing danger.").

The appellants' train expert Charles Culver said that Reithmeier should have kept the brake applied even after the girls moved to the opposite track; in his opinion Reithmeier should have continued to brake until no one was on the railroad bridge.

---

8. In *Evans*, a motorcyclist was injured as he rode up the defendant's road when he struck a neck-high cable strung across the road. 507 P.2d at 888. The trial court excluded the evidence of a previous motorcycle accident caused by the cable. *Id.* The Washington Court of Appeals reversed, noting that the evidence of a prior accident, combined with other evidence, might be a sufficient basis for a court to find the defendant guilty of wanton misconduct. *Id.* at 888–89.

Culver concluded that Reithmeier recklessly disregarded the safety of the girls because he knew they were there, he could have prevented the accident, and he did not. Robert Boston of the Washington Utilities and Transportation Commission concluded similarly that if Reithmeier saw the girls "that close to the bridge and in harms way, he should have-he should have slowed the train down enough to where he could get stopped before reaching the bridge." Although the district court viewed such evidence as establishing only the possibility of simple negligence, this evidence was sufficient in the totality of the circumstances, with the other evidence presented, to permit a jury to assess whether Reithmeier's conduct was wanton under Washington law.

That Reithmeier blew the train's whistle and slowed the train approximately 15 mph does not eliminate the possibility that a jury could conclude he acted wantonly. For example, if the engineer would have blown the train's whistle and slowed the train and the girls had not moved from his track, it is likely a reasonable jury could think that a decision to cease braking and drive over the track was wanton misconduct. A distinction in this case concerns how large an area must be considered the girls' "zone of danger." Amtrak argues that once the girls were off the east track, Reithmeier could consider them outside the zone of danger, even if they were on the other track on the trestle. Perhaps on that issue reasonable minds could differ. Reithmeier thought that zone's outer limit

to be the breadth of the train track upon which he was traveling. On the other hand, the Green River trestle is to a degree enclosed and elevated. At the time of impact, the girls were only about a foot off the end of the bridge, but still twenty feet from the end of the trestle and still about ten to fifteen feet from the ground. Therefore, a reasonable jury might conclude that the girls had little to no room to flee, and that they were effectively trapped on the trestle as a 450-ton train bore down on them at 65 mph.

### III

We hold that there are genuine issues of material fact, and that summary judgment was incorrectly granted.[9] Accordingly, we REVERSE and REMAND for further proceedings consistent with this judgment.

GOODWIN, Circuit Judge, concurring.

The dissent invites a brief comment on the malleability and context-dependence of the word "wanton." In literature "wanton" can be found as a noun, and as an adjective with half a dozen meanings. In legal usage, it appears most often coupled with "willful" as a combined epithet carrying pejorative freight. Case law in the State of Washington sheds light on legal usage: willful or wanton conduct is either knowing and intentional, or it evinces a reckless disregard for the safety of the person injured. *See, e.g., Sikking v. National Railroad Passenger Corp.* 52 Wash. App. 246, 758 P.2d 1003 1004 (1988).

9. The appellants also argue that Reithmeier's conduct was willful or wanton because it was motivated by or permitted by the "callous and inhumane corporate culture" of Amtrak. Appellants argue that: Amtrak does not require an engineer to do more than blow the horn for trespassers; Amtrak has no regulation requires an engineer to attempt to avoid killing or injuring a trespasser; Amtrak has no policy encouraging engineers to prevent fatalities

among trespassers; Amtrak engineers are not required to exercise more care in densely populated areas or if they see children; and Amtrak does not collect fatality records of engineers and they are not relevant to engineers' competency. Because we reverse and remand on other grounds relating to the specific conduct of engineer Reithmeier, we need not and do not reach the merits of appellants' claims focusing on the policies of the railroad.

The Restatement (Second) of Torts § 500 (1965) (updated 2004) teaches that reckless disregard involves knowing or having reason to know of facts which would lead a reasonable person to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent. The difficult question in this case is made somewhat more difficult because the facts require us to delete "willful" from the epithet. With volition removed, we are left with the meaning of reckless disregard in light of ambiguous facts.

The reviewing court once again faces the ageless question whether the application of an uncertain standard is, on the facts of a particular case, work for the court or work for the jury. Two members of the court think the facts known to the locomotive engineer made his conduct sufficiently problematic that a jury should decide whether that conduct showed a reckless disregard for the safety of others. The alternative is for the trial judge to take the question away from the jury because only one answer is viable as a matter of law. When words like "reasonable" and "unreasonable" appear in a standard of conduct, intuition suggests that juries are better fitted than are judges, to make the choice, because reasonableness is based largely on accumulated human experience. I concur.

FERNANDEZ, Circuit Judge, dissenting.

The evidence in this case is undoubtedly affecting.[1] However, the legal standards are exceedingly stringent. The majority properly quotes those standards, but it then applies them in a way that effectively allows a negligence principle to control. As I see it, the district court correctly decided that the evidence submitted could not meet Washington's often reiterated rules for deciding wantonness questions; it properly granted summary judgment. Thus, I respectfully dissent.

---

1. As I see it the majority's rendition of the evidence does not entirely account for the physics (time, velocity, distance, weight, etc.) of the situation, but nothing would be gained by belaboring that.

